**RICHLAND INDUSTRIES, LTD., Plaintiff,**

v.

**Loran ROBBINS, et al., Defendants.**

**No. 84 C 10105.**

United States District Court, N.D. Illinois, E.D.

Sept. 4, 1985.

Michael H. Auen, Foley & Lardner, Madison, Wis., for plaintiff.

Alan M. Levy, John E. Bardgett and Thomas J. Angell, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Richland Industries, Ltd. ("Richland II") sues the Trustees ("Trustees") of the Central States, Southeast and Southwest Areas Pension Fund (the "Fund") to recover withdrawal liability payments made under Section 4062 of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"

or simply the "Act"), 29 U.S.C. § 1362.[1] Richland II argues Trustees erroneously calculated the amount of withdrawal liability Richland II owed to the Fund by including the contribution history of Richland Industries, Inc. ("Richland I"), the corporation whose assets Richland II purchased.

Richland II and Trustees have filed cross-motions for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Richland II's motion is granted and Trustees' is denied.

### Facts [2]

From February 1, 1975 through July 11, 1979 Richland I submitted contributions to the Fund pursuant to a series of collective bargaining agreements ("CBAs") with Teamsters Local 695 ("Local 695"). Richland I was a wholly-owned subsidiary of TSC Industries, Inc. ("TSC"), which was in turn owned and controlled by Fuqua Industries, Inc.

On July 12, 1979—before the Act became effective—Dallman Investments, Inc. (the same corporation that later, by name change, became Richland II) purchased the operating assets (both tangible and intangible, including good will) of Richland I in a going-concern transaction. Before that time Richland II and Richland I had been entirely separate, independent corporate entities (no officers, directors or stockholders of Richland II had been employees, officers or directors of Richland I). Nor did either acquire any stock of the other as a result of the asset transaction. After the sale Richland I ceased its business activities, stopped contributing to the Fund and changed its name to R.I. Liquidating, Inc. In 1981 it merged into TSC.

As part of its asset purchase, Richland II acquired the right to use the trade name "Richland Industries." It changed its corporate name to Richland Industries, Ltd.

and continued production of the same products as Richland I, in the same facility and with the same employees. Under the purchase agreement, Richland II assumed all Richland I's future obligations under its CBA with Local 695. It immediately began contributing to the Fund as required by the CBA.

On November 30, 1981 the CBA Richland II had inherited expired. When the parties failed to negotiate a new agreement, on February 6, 1982 Local 695 went out on strike. On December 10, 1982 the NLRB decertified Local 695. That decertification permanently terminated Richland II's obligation to contribute to the Fund, a cessation that constituted a "complete withdrawal" within the meaning of Act § 1383.

In late December 1982 Richland II received from Trustees a request to file a "Statement of Business Affairs." Though the request was addressed to Richland I rather than Richland II, the latter timely filed the statement. It did so however on behalf of Richland I, at the same time advising Trustees Richland II was an employer different from Richland I.

In December 1983 Trustees sent Richland II a notice and "Demand For Payment of Withdrawal Liability." Again the notice was addressed to Richland I not Richland II. Trustees' "Demand" claimed a withdrawal liability in the amount of $35,378.69, based on the contribution history of Richland I dating back to 1975. Trustees later recalculated the liability to $37,717.97.

Richland II objected to the inclusion of Richland I's contribution history in the calculation of Richland II's withdrawal liability and filed a Request for Review. Trustees denied the request on the grounds that (Stip. Ex. G):

(5) ERISA section 4204, as amended by MPPAA, contains successorship provisions for assets sales on and after the

---

1. All citations to Title 29 will take the form "Act § —" or "ERISA §—" (in each instance using Title 29's numbering rather than the statute's internal numbering), depending on whether the provision was or was not modified or inserted anew by the Act.

2. Because the parties have stipulated to the facts, there is no need to apply the familiar rule requiring the drawing of inferences in favor of the party opposing summary judgment.

effective date of MPPAA but contains no provisions for pre-MPPAA assets sales. (6) With respect to pre-MPPAA assets sales involving labor law successors and the purchase of an on-going business, the Pension Fund has followed a consistent policy of including the seller's contributions in any determination of the buyer's withdrawal liability.

\* \* \* \* \* \*

For all of the reasons stated above, the Board of Trustees rejects the employer's position and reaffirms the policy with respect to pre-MPPAA assets sales involving on-going businesses.

Richland II paid the Fund (under protest) over $17,000 on the disputed liability. Trustees have denied Richland II's demands for a refund of those payments.

If Richland I's contribution history were not attributed to Richland II, the latter would face no withdrawal liability at all (any liability attributable solely to Richland II falls below the de minimis threshold established by the Act). And Richland II has not challenged Trustees' calculations except insofar as they include Richland I's contribution history. Thus the cross-motions pose a sole—an all-or-nothing—issue: whether Richland II may be held liable under the Act for unfunded vested liabilities that accrued during Richland I's regime.

### Relevance of NLRA Successorship Doctrines

Trustees' contention is that:

1. Nothing in the Act speaks to a pre-Act asset purchaser's liability under the Act for the seller's contribution history.

2. That silence justifies decision of the issue by reference to successorship doctrines developed under the National Labor Relations Act ("NLRA").

But the NLRA cases and doctrines cited by Trustees really do not bear on the question

here at all. Indeed, one of the cases Trustees themselves cite (Mem. 5), *Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 262–63 n. 9, 94 S.Ct. 2236, 2243–44 n. 9, 41 L.Ed.2d 46 (1974) (citations omitted and adapted to this case) emphasizes that Gertrude Stein's "A rose is a rose is a rose" analysis does not apply here:

> The question whether [Richland II] is a "successor" is simply not meaningful in the abstract. [Richland II] is of course a successor employer in the sense that it succeeded to operation of a [business] formerly operated by [Richland I]. But the real question in each of these "successorship" cases is, on the particular facts, what are the legal obligations of the new employer to the employees of the former owner or their representative? The answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc. There is, and can be, no single definition of "successor" which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others.

Trustees first cite a host of NLRA cases for the noncontroversial proposition that when a successor employer voluntarily assumes the predecessor's labor agreement, the successor is "fully responsible for the whole obligation" or "fully bound to every aspect of that agreement" (Trustees Mem. 7). That truism leads nowhere, for Richland II has concededly performed its only relevant obligation under the CBA: paying contributions into the Fund at a specified rate (Stip. Ex. A, Art. XXIV). No provision of the CBA even arguably deals with withdrawal liability payments.[3] As such cases

---

3. When Trustees advert to Richland II's contractual undertaking as to the CBA, they conveniently omit or pass over the relevant limitation

(Stip. Ex. B, Acceptance and Assumption of Collective Bargaining Agreement, emphasis added):

as *Debrecini v. Healthco-D.G. Stoughton Co.*, 579 F.Supp. 296, 297–98 (D.Mass.1984) and *T.I.M.E.-DC, Inc. v. Trucking Employees of North Jersey Welfare Fund, Inc.*, 560 F.Supp. 294, 297 (E.D.N.Y.1983) have recognized, withdrawal liability arises from the statute, not the CBA.

Trustees attempt to avoid the force of the *Debrecini-T.I.M.E.–DC* line of cases by arguing NLRA also renders a successor liable for its predecessor's *statutory* obligations, citing cases in which successors have been required to implement remedies imposed on their predecessors for the latters' unfair labor practices. Richland II argues forcefully the NLRA policies motivating those decisions are inapplicable here. But there is an even more fundamental problem with Trustees' approach: Richland I had no statutory liability for withdrawal payments at all. And because it did not, there was no derivative liability to be imposed on Richland II.

Thus Trustees miscast the issue when they speak in terms of forcing Richland II to shoulder Richland I's obligations, for the latter had neither a statutory nor a contractual obligation to pay Fund any more than it did. Hence the current question is solely a matter of Richland II's *own* obligations under the Act's formulas, and that question can be decided only by reference to the Act itself and its legislative history.

### Pre-Act Employer Withdrawals

To understand the Act, it is necessary to look first at the provisions of ERISA that preceded it. *Pension Benefit Guaranty Corp. ["PBGC"] v. R.A. Gray & Co.*, — U.S. ——, 104 S.Ct. 2709, 2713–15, 81 L.Ed.2d 601 (1984) explained both the structure of ERISA and the transition to the Act as to employers' withdrawal liability.

In consideration of the above Assignment, the undersigned, [Richland II] hereby represents and agrees that it has examined the Agreement, that it accepts this Assignment of the said Agreement, and that it hereby assumes and agrees to perform, discharge and keep all promises, covenants, conditions and agreements under said Agreement on the part of

ERISA was enacted in 1974, largely in response to the increasing number of terminations of pension plans before sufficient funds had been accumulated to pay vested benefits. One aspect of the legislation was the creation of PBGC, an insurer that collects premiums from covered plans and pays benefits to participants in those plans if the plans terminate with insufficient funds to cover guaranteed benefits.

Although PBGC automatically provided benefits to single employer plans, ERISA deferred its effective date for comparable automatic coverage of multiemployer plans. In the interim PBGC had discretion whether to provide benefits to beneficiaries of underfunded multiemployer plans upon termination of those plans. Employers participating in such plans were not necessarily liable, after withdrawal from the plans, for the underfunding of their employees' vested benefits. For any withdrawing employer, such liability was contingent on:

1. the plan's termination within five years of the employer's withdrawal; and

2. PBGC's discretionary decision to make payments to the employees after termination.

Only if PBGC exercised its discretion to insure employees of the terminated plan would PBGC assess withdrawal liability against any employer who had participated in the plan at any time in the last five years of its existence. That meant an employer escaped withdrawal liability altogether under ERISA if either (1) the plan continued in existence for five years after the employer's withdrawal or (2) PBGC declined to provide benefits on plan termination. And in any event the employer's liability was limited to 30% of the employer's net worth.

[Richland I] *to be performed, discharged and kept from and after the date hereof.*
Nothing in those future obligations spoke of, or even hinted at, withdrawal liability. And if they had, they would have embraced no more than an undertaking to pay *Richland I's* liability—which the following text discussion explains was wholly nonexistent.

Congress commissioned PBGC in 1978 to prepare a comprehensive report on the problems with ERISA's treatment of multiemployer plans, in the meantime further deferring the mandatory coverage of such plans. PBGC's July 1978 report, which provided the impetus for the Act, found ERISA failed adequately to protect plans from the adverse consequences of employer withdrawal. In fact ERISA actually *encouraged* early withdrawal from troubled plans because of:

    1. the chance the contingent liability would never be triggered;

    2. the fact the withdrawing employer could in any event defer liability until plan termination; and

    3. the formulation under which the earlier an employer withdrew, the smaller its post-plan-termination liability would be.

And of course the 30%-of-net-worth cap on withdrawal liability also factored into the equation, for it allowed some employers to avoid paying even their otherwise-calculated share of unfunded vested liability.

On February 27, 1979 PBGC recommended to Congress a new system, under which an employer withdrawing from a multiemployer plan would be automatically liable for whatever share of the plan's unfunded vested liability was attributable to that employer's participation in the plan. Because Congress feared the prospect of such legislation would prompt a massive withdrawal from existing plans to avoid the proposed withdrawal liability, Congress early announced that whatever legislation it enacted would be retroactive to February 27, 1979, the date of PBGC's proposal. Ultimately that retroactive date was changed to April 29, 1980.

### Withdrawal Liability Under the Act

One of the Act's provisions creates automatic withdrawal liability extending back even to an employer's pre-Act contribution history. That retroactive application was upheld in *Gray*, 104 S.Ct. at 2717–20. But even though an employer may be held liable for its *own* pre-Act contribution history,

it may not be held liable under most circumstances for the pre-Act contribution history of *other* employers. In particular, Act § 1384 clearly establishes that a purchaser of assets may not be held liable for the seller's contribution history, absent a special arrangement with the seller by which the purchaser voluntarily assumes that liability. No such arrangement was made here. Under the unambiguous provisions of the statute, there is really no room to argue Richland II is liable for Richland I's contribution history.

### 1. Application of the Act's Formula to Richland II

Trustees' basic position is that the Act's silence as to the treatment of a pre-Act asset sale represents a "gap" that must be filled in by the courts. Examination of the Act, however, discloses no gap at all in its prescribing how to compute the liability of an asset purchaser that withdraws *after* the effective date of the Act. Instead the Act provides crystal-clear (albeit complex) formulas for calculating that liability.

Act § 1391(c) establishes a formula that precludes any consideration of the unfunded vested liabilities of Richland I, which concededly withdrew from the Fund upon its sale of assets in 1979. Under that formulation, Act § 1391(c)(2) calls for calculation of the total amount of the Fund's unfunded vested liabilities for its last fiscal year ended before April 29, 1980. Richland II's liability is then computed by multiplying that figure by the following fraction (Act § 1391(c)(2)(B)(ii)(I) and (II)) (emphasis added):

the sum of all contributions required to be made by *the employer* under the plan for the last 5 plan years ending before April 28, 1980

[divided by]

the sum of all contributions made for the last 5 plan years ending before April 29, 1980 by all employers who had an obligation to contribute under the plan *for the first plan year ending after April*

*29, 1980* and who had not withdrawn from the plan before such date.

It is plain "the employer" referred to in the numerator means the current employer whose liability is being calculated. And the denominator deals only with employers participating in the plan after the effective date of the Act. Thus each part of the fraction by its terms excludes Richland I's contribution history.

Trustees do not dispute that clear reading of the formula's language. Rather they seem to contend alternatively:

1. Richland I and Richland II should be considered a single "employer" for purposes of the formula.

2. General policy considerations behind the Act compel the inclusion of Richland I's liability in the calculations.

Those arguments will be dealt with in turn (although neither requires extended discussion).

### 2. "Single Employer" Issue

There are explicit statutory provisions defining when successive employers can be considered a single "employer" for purposes of calculating withdrawal liability. ERISA § 1362(d) (left *unchanged* by the Act, and made applicable to multiemployer plans by Act § 1398) provides successor corporations will be liable for the contribution history of their predecessors after certain events:

(d) For purposes of this section the following rules apply in the case of certain corporate reorganizations:

(1) If an employer ceases to exist by reason of the reorganization which involves a mere change in identity, form, or place of organization, however effected, a successor corporation resulting from such reorganization shall be treated as the employer to whom this section applies.

(2) If an employer ceases to exist by reason of a liquidation into a parent corporation, the parent corporation shall be treated as the employer to whom this section applies.

(3) If an employer ceases to exist by reason of a merger, consolidation, or division, the successor corporation or corporations shall be treated as the employer to whom this section applies.

It would distort that statute, with its specific enumeration of the kinds of acquisitions (ERISA § 1362(d)(3)) as well as the kinds of corporate restructurings (ERISA § 1362(d)(1) and (2)) to which a "single employer" rule applies, to insert a sale-of-assets acquisition—conspicuously absent from ERISA § 1362 and hence from Act § 1398.

In fact, the Act explicitly treats asset sellers and purchasers as *separate* employers. Section 1384 (in tandem with Section 1383(a)) establishes that an arms' length sale of assets normally occasions a complete withdrawal from the plan by the seller. That subjects the seller to full withdrawal liability. And the purchaser undertakes no liability at all for the seller's contribution history, unless the purchaser posts a special bond and the seller agrees contractually to assume secondary liability for its contribution history.

Although that statutory framework of Act § 1384 was not in effect at the time of the Richland I–Richland II asset sale, it is instructive for two reasons:

1. It wholly forecloses the possibility of considering Richland I and Richland II jointly as "the employer" under Act § 1391(c)(2)(B)(ii)(I).

2. It underscores just how implausible Trustees' position is.

That last point may need a bit of explication. Trustees must concede that had the Act never become law, Richland II would not have been liable for Richland I's unfunded vested liabilities under ERISA. And had the Act been enacted *before* the asset sale here, Act §§ 1383 and 1384 would have protected Richland II from liability for Richland I's history (unless of course Richland II *voluntarily* assumed such liability, as it did not). It is thus wholly bizarre for Trustees to contend that although *neither* statute by its terms would saddle Richland II with Richland I's

liability, the transition from one statute to the other somehow (sub silentio) rendered Richland II so liable.

### 3. Policy Considerations

Finding no support at all in the language of the Act, Trustees attempt to override the statute by resort to its legislative history. That effort calls into play the reverse principle of statutory interpretation criticized by Justice Stevens, dissenting in *Kosak v. United States*, 465 U.S. 848, 104 S.Ct. 1519, 1531, 79 L.Ed.2d 860 (citation omitted):

> Therefore, this is "a case for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute."

Trustees urge a primary purpose of the Act was to render each employer liable for its proportionate share of liability. From that they reason it would be unfair to saddle the Fund's other contributing employers with unfunded vested liability left by Richland II's predecessor. Such fairness considerations, however, cut both ways. It would be at least equally unfair to saddle Richland II with Richland I's liability, when it was the latter that obviously reaped the benefits of underfunding.

In all events, though, such policy considerations are far more appropriately addressed to Congress in the first instance than to the courts. And Congress specifically recognized, when it passed the Act, that plans would carry over unfunded vested liabilities from the ERISA withdrawal regime. When Congress moved the effective date of the Act forward from 1979 to 1980, it acknowledged that plans would necessarily bear the burden of swallowing the unfunded vested liability of employers (such as Richland I) who withdrew during that interim period (*Gray*, 104 S.Ct. at 2715, quoting 126 Cong.Rec. 510101 (July 29, 1980) (statement of Sen. Javits)):

> The committees decided in part to move up the date from February 27, 1979, the date contained in earlier versions of the bill, because the original purpose of a retroactive effective date—namely, to avoid encouragement of employer withdrawals while the bill was being considered—has been achieved. It should also be noted that the April 29 effective date is the product of strong political pressures by certain withdrawing employers who were caught by the earlier date. I realize that permitting these employers to avoid liability only increases the burdens of those employers remaining with the plans in question, but it appears necessary to accept the April 29 date in order to enact the bill before the August 1 deadline for action.

If any inference is to be drawn from legislative history, it is precisely the opposite of what Trustees claim. Congress deliberately chose to remove transactions in the gap period—February 27, 1979 to April 29, 1980—from the impact of the Act. It would be irresponsible, in policy terms as well as in terms of statutory construction, to subvert the effects of that legislative choice as Trustees would ask. Effectively Congress opted to let Richland I off the hook, and Richland II cannot be forced to pay the price.

Indeed Congress was even willing to release employers withdrawing *after* the Act's effective date from liability for certain of their own employees' unfunded vested benefits that had accrued before the Act took effect. Thus Act § 1397 excludes from consideration in determining such an employer's liability:

> 1. contributions made under a CBA under which the contribution obligation expired before the Act; and
>
> 2. contributions made for work performed at a facility if before the Act became effective;
>
>> (a) the facility had ceased operations or
>>
>> (b) the contribution obligation with respect to the facility's employees had ceased.

Plainly, then, Congress did not intend that the Act immediately eliminate all unfunded vested liabilities then in existence. Rather, the Act's withdrawal liability provisions reflect a congressional attempt to

institute a fair and prudent method for dealing with future withdrawals. And Trustees have failed to produce even a shred of evidence Congress intended to hold pre-Act arms' length asset purchasers liable for the contribution histories of their predecessors.

### 4. Effect of Trustees' Construction

One final point bears brief mention. Trustees try to engage in a bit of boot-strap-lifting by urging deference for their own reading (or as this opinion has demonstrated, misreading) of the operative rules of law. To that end they call on *Wardle v. Central States, Southeast and Southwest Areas Pension Fund,* 627 F.2d 820, 823–24 (7th Cir.1980). But *Wardle* simply gives strong credence to trustees' readings of the plans they administer, for purposes of granting or denying plan benefits. That unexceptable principle does not extend to the interpretation of statutes, a task for which trustees are scarcely suited as experts generally (and for which Trustees here have shown they are specifically unqualified).

### Conclusion

There is no genuine issue of material fact, and Richland II is entitled to a judgment as a matter of law. Trustee's cross-motion for summary judgment is of course denied. This Court further finds Trustees' legal position to have been sufficiently empty to justify the award to Richland II of the costs and expenses incurred in this action, including reasonable attorneys' fees (Act § 1451(e)). Because the ultimate relief requested by the Complaint cannot be calculated from the Stipulation alone, this case is set for a further status report at 9:00 a.m. September 12, 1985.