**AMALGAMATED INSURANCE FUND, Plaintiff,**

v.

**WILLIAM B. KESSLER, INC., Defendant.**

No. 83 Civ. 4438.

United States District Court, S.D. New York.

Nov. 25, 1985.

---

Booth, Lipton & Lipton, New York City, for plaintiff.

Levin & Weintraub & Crames, New York City, for defendant.

## OPINION

GRIESA, District Judge.

This is an appeal from a decision by Bankruptcy Judge Ryan, dated October 19, 1982, and the subsequent order of November 9, 1982, in which he held that a claim for "withdrawal liability" was not entitled to priority status as an administrative expense claim, but would be treated as a general unsecured claim. *In re Kessler*, 23 B.R. 722 (Bankr.S.D.N.Y.1982). The ruling is affirmed.

Following the submission of briefs on this appeal, it was agreed that an evidentiary hearing would be held. This hearing occurred on January 21, 1985. Thereafter, additional briefs were submitted.

Kessler, a clothing manufacturer, filed a Chapter 11 petition on November 21, 1980. Thereafter Kessler continued to operate its business as debtor in possession. Amalgamated Insurance Fund ("Amalgamated") is a multiemployer retirement and social insurance fund and is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1001 *et seq.*

For many years Kessler had contributed, on behalf of its employees, to pension and insurance plans operated by Amalgamated.

In June 1981 certain transactions were carried out which had the effect of transferring assets of Kessler to Merchandising Corporation of New Jersey. Amalgamated entered into an agreement providing that it would not assert any claims against the assets to be transferred to Merchandising Corporation. However, the agreement confirmed the right of Amalgamated to file and prove a claim in the Chapter 11 proceeding of Kessler. It was specified that the claim would be entitled—"To priority, if any, in accordance with the normal rules of the Bankruptcy Code."

In July 1981 Kessler discharged its employees, and ceased operations. At this

time Kessler ceased making its regular contributions to Amalgamated.

Amalgamated filed three claims in the Chapter 11 proceeding. The third one, filed on December 23, 1981, is the only one presently at issue. The December 1981 claim was for two items: (1) unpaid contributions in the amount of $17,613.38, and (2) "withdrawal liability" in the amount of $4,347,640.19. In its claim, Amalgamated asserted that both items were administrative expenses entitled to priority status. On February 9, 1982 Kessler filed a response to Amalgamated's claim. Kessler had no objection to conferring priority status on the unpaid contribution item of $17,613.38. This related to contributions which came due during the Chapter 11 proceeding. However, Kessler took the position that the withdrawal liability should be reclassified as a general unsecured claim.

Bankruptcy Judge Edward J. Ryan held a hearing on April 23, 1982. He issued his decision on October 19, 1982 and an order on November 9, 1982. Judge Ryan's ruling was that the claim for withdrawal liability was to be reclassified as a general unsecured claim.

Amalgamated appeals to the District Court from this ruling.

### Facts
#### Withdrawal Liability

Prior to the enactment of ERISA in 1974, certain problems developed with respect to employee pension plans. One of them was that the plans were providing for large amounts of future benefits which were not being fully funded. Commonly the pension plans were based on contributions by employers, and it was frequently the case that the contributions would only cover the current benefits of retirees.

ERISA, enacted in 1974, establishes the basic policy that employee pension plans should provide vested benefits to the employees. ERISA further requires employee pension plans to meet minimum standards of funding. 29 U.S.C. § 1001(c). Past accumulations of unfunded vested liabilities must be brought up to date. The statute permits this to be done over time. In the case of Amalgamated, the law allows the funding of its pre-ERISA vested liabilities over a period of 40 years beginning in 1976. *See* 29 U.S.C. § 1082(b)(2)(B)(i).

The funding requirement just described relates to unfunded vested liability which accumulated before ERISA. However, even after ERISA, unfunded vested liability relating to past service by employees could increase. This would occur when a pension fund increased the level of benefits. Such an increase in effect "relates back." It raises the level of benefits for those who earned their benefits before the time of the increase—sometimes many years before—as well as for those who are earning their benefits currently. In the case of Amalgamated, there have been certain increases in the level of benefits since the enactment of ERISA. The law allows these benefit increases to be funded over a period of 10 years for pensioners and surviving beneficiaries, and 25 years for vested plan participants. 29 U.S.C. § 1423(d)(1)(B)(ii).

When a contributing employer withdraws from a group pension plan, this creates a problem regarding that employer's share of any unfunded vested liabilities. Prior to MPPAA such an employer was under no obligation to pay his share of the unfunded vested liability. MPPAA establishes the concept of "withdrawal liability." The statute imposes upon the withdrawing employer a liability for his share of the total unfunded vested liability of the pension plan to which he has been contributing. 29 U.S.C. §§ 1381 and 1383(a). This share is fixed according to one of several methods provided in the statute. 29 U.S.C. § 1391.

#### Kessler and Amalgamated

Kessler was a manufacturer of men's and boys' clothing. It joined the Clothing Manufacturers Association ("CMA") in 1939. Over the years CMA entered into collective bargaining agreements with the Amalgamated Clothing Workers of America. Since 1942 CMA members have contributed to the Amalgamated pension plan

to provide benefits to the employees of the various CMA members. The contributions take the form of a fixed percentage of payroll. The percentage at any given time is specified in the applicable collective bargaining agreement. Kessler began contributing to Amalgamated in 1945.

Prior to ERISA, Amalgamated collected enough contributions from the participating employers to pay benefits to current retirees, but future benefits went unfunded. Moreover, prior to MPPAA, when a contributing employer went out of business or otherwise withdrew, Amalgamated had no procedure under which the withdrawing employer would pay his share of the unfunded vested liability. This share fell upon the remaining participating employers.

It should be noted that for many years the clothing industry in the United States has been declining. The number of workers has plummeted, while the number of retirees has grown substantially. In 1955 there were 108,000 active employees of CMA members and 13,000 retired employees receiving benefits. As of 1984 there were only 48,000 active employees and 40,000 retirees. Thus, over a long period of time, the employee base, on which contributions to the retirement fund have been assessed, has been declining. The number of employers contributing to the fund has also been declining. As of the time MPPAA was enacted, an employer participating in the Amalgamated fund was shouldering not only the unfunded vested liability which might be said to be attributable to his own employees, but also a share of such liabilities which were attributable to employees of companies which had gone out of business.

At the time MPPAA came into effect, Amalgamated had a very large unfunded vested liability. As of December 31, 1979, the figure was $441 million. On December 31, 1980 the figure was somewhat lower—$425 million.

Kessler's withdrawal liability was calculated as of December 31, 1980. This liability is Kessler's share, as of that date, of the total unfunded vested liability of Amalgamated. The amount is calculated under a formula which compares Kessler's contributions with the total contributions to the fund over the previous several years. *See* 29 U.S.C. § 1391(b)(3). The amount resulting from this calculation is $4,347,640. In the absence of bankruptcy Kessler would have 20 years to satisfy this obligation.

Kessler did not literally become liable for the withdrawal liability until it ceased operations in July 1981, during the pendency of the Chapter 11 proceeding. However, it is important to keep in mind that Kessler's withdrawal liability is merely its share of the total unfunded vested liability of Amalgamated. Thus, it is relevant to consider the question of when the unfunded vested liability of Amalgamated accrued. Specifically, what was the time of accrual of the $425 million unfunded vested liability of Amalgamated, which existed as of December 31, 1980? The answer is that the great bulk of this liability accrued over a period of decades prior to the enactment of ERISA. It is conceded that the entire amount of the $425 million accrued before the filing of the Kessler Chapter 11 petition on November 21, 1980. There is no contention that any amount of this liability accrued between that date and the calculation date—December 31, 1980.

It is also important to note, in line with the earlier discussion, that Kessler's withdrawal liability relates not only to unfunded vested liabilities attributable to its own employees, but also to what is attributable to the employees of other companies which have gone out of business.

### Discussion

Section 507(a)(1) of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 507(a)(1), grants a first priority in distribution to claims which are allowed as expenses of administration under § 503. Section 503(b)(1)(A), 11 U.S.C. § 503(b)(1)(A), allows as administrative expenses "the actual,

necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case."

There appears to be no judicial holding directly in point—*i.e.*, dealing with the question of whether withdrawal liability is an administrative expense in a bankruptcy proceeding. However, the general rules governing administrative expenses are well established.

■ In a Chapter 11 proceeding, where the debtor remains in business, administrative expenses include the costs of carrying on the debtor's business after the commencement of the proceeding. 3 *Collier on Bankruptcy*, ¶ 503.04[1][a][i] (15th ed. 1985). They relate to activities during the proceeding, not to claims and debts which accrued prior thereto. *See In re Meyer's Inc.*, 15 B.R. 390, 392 (Bankr.S.D.Cal.1981). Usually administrative expenses involve payments for goods and services obtained by the debtor. Administrative expenses also include legally imposed costs, such as tort liability arising during the bankruptcy proceeding, *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), and the cost of legally required labor negotiation. *Yorke v. NLRB*, 709 F.2d 1138, 1143 (7th Cir.1983).

Compensation to employees for services rendered during the bankruptcy proceeding is an administrative expense. It is conceded that this includes indirect compensation consisting of payments to a pension fund for the benefit of employees.

■ Generally, debts which accrue prior to the bankruptcy proceeding are not administrative expenses, even if they are not payable until some date during the proceeding. Thus, where a certain amount of vacation pay accrues to employees prior to the bankruptcy proceeding, and then an additional amount accrues during the proceeding, only the latter portion will be considered an administrative expense. *Straus-Duparquet, Inc. v. Local 3, Inter-*

*national Brotherhood of Electrical Workers*, 386 F.2d 649 (2d Cir.1967).

Severance pay for employees terminated during the bankruptcy proceeding has been held by the Second Circuit to constitute an administrative expense. *In re W.T. Grant Co.*, 620 F.2d 319 (2d Cir.), *cert. denied*, 446 U.S. 983, 100 S.Ct. 2963, 64 L.Ed.2d 839 (1980); *Straus-Duparquet, supra*. This is true, despite the fact that the amount of severance pay is typically tied to the length of service, and therefore may be based in part on service occurring before the commencement of the proceeding. This Circuit distinguishes severance pay from vacation pay on the question of bankruptcy claim classification. The Circuit reasons that vacation pay is earned from day to day and accrues as it is earned. On the other hand, severance pay, although calculated on the basis of length of service, is not earned until the time of termination. Where the termination occurs during the bankruptcy proceeding, the termination pay is a cost of business activity occurring during that proceeding, and so is an administrative expense. *W.T. Grant Co., supra; Straus-Duparquet, supra*. Other circuits have held to the contrary. *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir.1976); *In re Public Ledger*, 161 F.2d 762, 771–73 (3d Cir.1947).

In applying these rules and authorities to the present case, Amalgamated argues that the withdrawal liability of Kessler was a cost of terminating Kessler's employees during the Chapter 11 proceeding, analogizing withdrawal liability to severance pay, and relying on *Straus-Duparquet*. Amalgamated argues that the withdrawal liability of Kessler did not accrue until the termination of the employees, and that therefore this indebtedness arose during the time of the Chapter 11 proceeding and not before. Kessler, on the other hand, argues that the withdrawal liability accrued over a long period of time prior to the Chapter 11 proceeding, and cannot therefore be considered an administrative expense.

**740**

The court holds that the withdrawal liability of Kessler is not an administrative expense. This liability is Kessler's pro rata share of Amalgamated's unfunded vested liability as of the calculation date—December 31, 1980. By virtue of their promises of pension benefits over a period of decades, payable through the instrumentality of Amalgamated, the participating CMA employers accumulated a liability for unfunded benefits. As of the late 1970's this was over $400 million. This liability grew up over a long term of years, and, under ERISA, a long-term payout is permitted—40 years commencing in 1976. As explained above, withdrawal liability is merely a substitute for the continuing contributions a withdrawing employer would otherwise make toward fully funding vested benefits. Kessler's liability for its share of Amalgamated's unfunded vested benefits existed long before the start of the Chapter 11 proceeding. Thus, withdrawal liability is not a cost of business activity occurring during the Chapter 11 proceeding.

Withdrawal liability is not analogous to the severance pay in *Straus-Duparquet,* as is so strongly argued by Amalgamated. Severance pay is "compensation for termination of employment." *Straus-Duparquet,* 386 F.2d at 651. When termination occurs during the bankruptcy proceeding, claims for severance pay are entitled to administrative expense status because severance pay is compensation for losses terminated employers will bear after the bankruptcy proceeding commenced. Withdrawal liability, on the other hand, is imposed on employers withdrawing from multiemployer pension plans to make up for past failures by employers to fund fully pension plan benefits. Essentially, withdrawal liability is belated compensation for services provided before the start of bankruptcy proceeding. As such, a claim for withdrawal liability is not entitled to administrative expense status.

The decision of the bankruptcy court is affirmed.

So ordered.