**In the Matter of GEE & MISSLER SERVICES, INC., Debtor.**

**Bankruptcy No. 84–01051–B.**

United States Bankruptcy Court, E.D. Michigan, S.D.

July 2, 1986.

Goldstein, Goldstein & Bershad, P.C. by Martin L. Fried, Southfield, Mich., for debtor.

Sullivan, Ward, Bone, Tyler, Fiott & Asher, P.C. by Diane G. Biggar, Dearborn, Mich., for Pension Trust Fund.

## MEMORANDUM OPINION

GEORGE BRODY, Chief Judge.

The question presented is whether a claim against a Chapter 11 debtor for withdrawing from a pension fund created by a collective bargaining agreement is subject to the limitation imposed by Section 502(b)(7) of the Bankruptcy Code. 11 U.S.C. § 502(b)(7) (Supp. II 1984).

The facts have been stipulated by the parties and are as follows:

The Debtor, Gee & Missler Services, Inc., is an employer engaged in the heating and cooling business. From approximately 1981 through July, 1984, the Debtor was a member of an employers' association known as SMACNA, Metropolitan Detroit Chapter (hereinafter referred to as the "Association") for collective bargaining purposes. Pursuant to the terms of a collective bargaining agreement reached between the Association and the Sheet Metal Workers Local Union No. 80 (hereinafter referred to as the "Union"), the Debtor became obligated to contribute to the Sheet Metal Workers Local Union No. 80 Pension Trust Fund (hereinafter referred to as the "Pension Fund").

On approximately March 22, 1984, the Debtor filed its Petition for reorganization and sought to reject the collective bargaining agreement. Negotiations between SMACNA and the Union were held which ultimately resulted in the Debtor's subsequent affirmance of the contract in December, 1985. The Debtor did not contribute to the Pension Fund from March, 1984 through December, 1984.

Upon affirmance of the contract, the Debtor began to contribute to the Pension Fund until May 31, 1985, at which time the collective bargaining agreement expired. The contract was not renewed nor renegotiated by the Debtor. The Debtor has not made contributions to the Sheet Metal Workers Union Local No. 80 Pension Trust Fund since May, 1985.

In November, 1984, the Pension Fund filed its claim for withdrawal liability in the amount of Eleven Thousand Five Hundred Seventy ($11,570) Dollars, pursuant to the Employee Retirement Income Security Act, 29 USC section 1001, et seq., and the Multiemployer Pension Plan Act, 29 USC section 1381 et seq.

On September 6, 1985, the Pension Fund filed an amended withdrawal liability claim for One Hundred Thousand Six Hundred Eighty Five ($100,685) Dollars.[1]

In 1974, Congress enacted the Employee Retirement Income Security Act (ERISA), Pub.L. 93–406, 88 Stat. 829, (codified as amended at, 29 U.S.C. § 1001, *et seq.* (1982 ed)). ERISA was enacted in response to the congressional concern over the lack of safeguards protecting the interests of plan beneficiaries. "ERISA ... establishes the basic policy that employee pension plans should provide vested benefits to the employees. ERISA further requires employee pension plans to meet minimum standards of funding. 29 U.S.C. § 1001(c). Past accumulations of unfunded vested liabilities must be brought up to date." *Amalgamated Insurance Fund v. William B. Kessler, Inc.,* 55 B.R. 735, 737 (S.D.N.Y.1985).[2] ERISA, as originally enacted, however, permitted some employers who withdrew from multiemployer plans to avoid further liability for vested benefits which were unfunded at the time of withdrawal. *See, Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 720–721, 104 S.Ct. 2709, 2713, 81 L.Ed.2d 601 (1983); *Peick v. Pension Benefit Guaranty Corp.,* 724 F.2d 1247, 1252 (7th Cir.1983) *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984); *Trustees of the Amalgamated Insurance Fund v. McFarlin's, Inc.,* 789 F.2d 98, 102 (2d Cir.1986). The failure to address the problem that resulted when an employer withdrew from a mul-

tiemployer pension plan posed a grave threat to the continued existence of multiemployer pension plans and to the program of benefit insurance. *Connolly v. Pension Benefit Guaranty Corp.,* — U.S. —, 106 S.Ct. 1018, 1021–1022, 89 L.Ed. 166 (1986); *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. at 721, 104 S.Ct. at 2713.

Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities. The rising costs may encourage—or force—further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue. Pension Plan Termination Insurance Issues: Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means, 95th Cong., 2nd Sess., 22 (1978).

*Pension Benefit Guaranty Corporation v. R.A. Gray & Co.,* 467 U.S. at 722–723, n. 2, 104 S.Ct. at 2714, n. 2. To remedy this problem and to encourage participation in and the continuance of multiemployer pension plans, Congress amended ERISA by enacting the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub.L. 96–364, 94 Stat. 1208. *See* 29 U.S.C. § 1001a (1982 ed.). The primary purpose of MPPAA was to

protect retirees and workers who are participants in [multiemployer] plans against the loss of their pensions.... [The bill] requires employers who withdraw from a multiemployer plan, or who experience severe declines in their cover-

---

1. The Pension Fund initially filed its claim as a priority claim. Subsequently, the Pension Fund conceded that its withdrawal liability claim is not entitled to priority. This concession does not apply to any claim that the Fund may have for unpaid contributions for the period of March through December 1984.

2. For a discussion of the interrelationship between the Employee Retirement Income Security Act (ERISA) and the Bankruptcy Code, *see* Novikoff and Polebaum, *Pension-Related Claims in Bankruptcy Code Cases,* 40 Bus. Lawyer 373 (Feb.1985).

ed operations under the plan, *to continue to fund* their fair share of the plan's unfunded benefit obligations. H.R.Rep. No. 869, 96th Cong., 2d Sess. Part I 51–52, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2918, 2919–2920 ["H.R.Rep. No. 869"] (emphasis added). *In re Pulaski Highway Express, Inc.*, 57 B.R. 502, 505 (Bankr.M.D.Tenn.1986). The withdrawal liability imposed by the MPPAA is the basis of the Pension Fund's claim.

The debtor concedes that the Pension Fund has a withdrawal liability claim. However, the debtor contends that the claim resulted from the termination of a collective bargaining agreement, that a collective bargaining agreement is an employment contract, and therefore the claim is subject to the limitation imposed by section 502(b)(7).[3]

Section 502(b)(7) provides that the "claim of an employee for damages resulting from the termination of an employment contract"[4] shall not be allowed in excess of:

(A) the compensation provided by such contract, without acceleration, for one year following the earlier of—

(i) the date of the filing of the petition; or

(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

(B) the unpaid compensation due under such contract without acceleration, on the earlier of such dates; ...

The legislative history which accompanied the section as originally enacted by the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549, states:

Paragraph [7] is new. It tracks the landlord limitation on damages provision in paragraph [6] for damages resulting from the breach by the debtor of an employment contract, but limits the recovery to the compensation reserved under an employment contract for the year following the earlier of the date of the petition and the termination of employment.

House Rep. No. 595, 95th Cong., 1st Sess. 354 (1977), *reprinted in,* 1978 U.S.Code Cong. & Ad.News, 5963, 6310. *See also,* Senate Rep. No. 989, 95th Cong., 2d Sess. 64–5 (1978), *reprinted in,* 1978 U.S.Code Cong. & Ad.News, 5781, 5850–1.

█ There is no merit to the debtor's contention that the term "employment contract" in section 502(b)(7) embraces collective bargaining agreements. The term "employment contract" is not defined in section 502(b)(7) or in any other Code provision, nor does the legislative history suggest a definition. However, case law clearly establishes that a collective bargaining agreement is not an employment contract. A collective bargaining agreement is "a generalized code to govern a myriad of cases which the draftsman cannot wholly anticipate.... The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant." *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 550, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964) citing *United Steelworkers of America v. Warrior & Gulf Navigation Company,* 363 U.S. 574, 578–579, 80 S.Ct. 1347, 1351, 4 L.Ed.2d

---

**3.** Prior to the enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, § 445(b)(4), 98 Stat. 333, 373, section 502(b)(7) was designated as 502(b)(8).

**4.** The words "claim of an employee" were added to section 502(b)(7) by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, § 445(b)(7)(A), 98 Stat. 333, 373. The chapter 11 was filed on March 22, 1984. Section 502(b)(8), as originally enacted, is therefore the appropriate law to be applied.

*See,* BAFJA, Pub.L. No. 98–353, § 553(a), 98 Stat. 333, 392, redesignated as § 552(a) by Pub.Law No. 98–531, 98 Stat. 2704 (Oct. 19, 1984) (noted at 11 U.S.C. § 502 (Supp. II 1984)). Prior to 1984, section 502(b)(7) limited the claim of both an employee and an employer. Under the 1984 amendment, an employer's claim resulting from the termination of an employment contract is no longer subject to the limitation imposed by section 502(b)(7). The 1984 amendment did not change existing law as it relates to the claim of an employee.

1409 (1960). An employee is hired by an employer. When he is hired, he may become a union member and may be covered by a collective bargaining agreement which the union has negotiated with the employer. However, he is not hired by the collective bargaining agreement. Nor does the rejection of a collective bargaining agreement terminate the employment of an employee. In *J.I. Case Co. v. National Labor Relations Board,* 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944), the Supreme Court succinctly summarized the difference between an employment contract and a collective bargaining agreement.

> [C]ollective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone. The negotiations between union and management result in what often has been called a trade agreement, rather than in a contract of employment....
>
> ... The employer, except as restricted by the collective agreement itself and except that he must engage in no unfair labor practice or discrimination, is free to select those he will employ or discharge.

*J.I. Case,* 321 U.S. at 334–335, 64 S.Ct. at 579. *See also, Hoover Motor Express Company, Inc. v. Teamsters Chauffeurs, Helpers and Taxicab Drivers Local Union No. 327,* 217 F.2d 49, 52 (6th Cir.1954); *Local 205, United Electrical, Radio & Machine Workers of America (UE) v. General Electric Company,* 233 F.2d 85, 98–99 (1st Cir.1956), *aff'd on other grounds* 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028 (1957); *Lewittes & Sons v. United Furni-*

*ture Workers of America CIO,* 95 F.Supp. 851 (S.D.N.Y.1951) (cases construing term "employment contract" as used in Section 1 of the United States Arbitration Act, 9 U.S.C. § 1).

Two cases, *In re Cortland Container Corporation,* 30 B.R. 715 (Bankr.N.D.Ohio 1983), and *In re Continental Airlines Corporation,* 57 B.R. 845 (Bankr.S.D.Tex. 1985), hold that a collective bargaining agreement is an employment contract. These cases, however, are not persuasive. In *Cortland,* the court held that a collective bargaining agreement is an employment contract because "[t]o hold otherwise would create an artificial distinction unwarranted by bankruptcy law provisions between employers with union employees and employers with non-union employees." 30 B.R. at 717. However, this ratio decidendi begs the question. The question is not whether union and non-union employees should be treated in the same manner, but whether a collective bargaining agreement is an employment contract. The opinion also fails to disclose whether the court was aware of the cases that hold that a collective bargaining agreement is not an employment contract, and further if it were aware of such cases, why they are not dispositive of the issue. *Continental Airlines* merely adopts the conclusion reached by *Cortland.*

Moreover, there is nothing in the Code or the legislative history to suggest that Congress intended to limit the claims of rank and file union members. Section 502(b)(7) was designed, as commonly assumed, to limit the claims of key executives—employees, who for one reason or another, were able to exact long-term contracts calling for substantial remuneration. The Bankruptcy Code was the product of prolonged, extensive study and deliberation.[5] It is reasonable to assume that if Congress had

---

**5.** *See* Klee, *The Legislative History of the New Bankruptcy Code,* 54 Amer.Bankr.L.J. 275 (1980). The article traces the arduous journey of the Bankruptcy Code "surrounded by controversy and intrigue" through Congress, from the introduction of the bill drafted by the Commission on Bankruptcy Laws in 1973, through its final enactment in November of 1978. Mr. Klee was Associate Counsel for the House Judiciary Committee's Subcommittee on Civil and Constitutional Rights, which was involved in the drafting of the Bankruptcy Reform Act of 1978 from March 1974 to August 1977.

intended to limit the claims of rank and file union members, there would have been a clear expression of such intention in the legislative history.

■ Additionally, the withdrawal liability claim filed by the Pension Fund, even if it were a claim arising from the termination of an employment agreement, is not subject to the limitation imposed by section 502(b)(7). Section 502(b)(7) limits the claim of an employee. It does not limit the claim of an entity other than an employee. "Withdrawal liability does not compensate employees directly even though employees may benefit from it." Novikoff & Polebaum, *supra*, n. 2 at 414 n. 305. The fact that employee members of the Fund may benefit from recovery by the Fund does not convert the claim of the Fund to a "claim of an employee."

The thrust of section 502(b)(7) is to limit claims arising out of the rejection of an executory contract. Section 502(b)(7) limits a claim for future compensation, which conceivably would have been earned had the parties continued to perform under the terminated contract. Section 502(b)(7) does not limit a claim for which the employer has received all the consideration for which it has bargained, and all that remains to be done is for the employer to fulfill its obligation of payment. *See*, section 502(b)(7)(B). The MPPAA imposes an obligation upon a withdrawing employer "to compensate a pension plan for benefits that have *already vested* with the employees at the time of the employer's withdrawal." *Pension Benefit Guaranty Corp. v. R.A. Gray Co.*, 467 U.S. at 733–734, 104 S.Ct. at 2720 (emphasis added). The employer has received all the bargained-for consideration. All that remains is for the employer to make the payments necessary to adequately fund the plan. *In re Alan Wood Steel Company*, 4 Bankr.Ct.Dec. (CRR) 850 (Bankr.E.D.Pa.1978). Withdrawal liability is thus rooted in the past. Withdrawal liability is triggered by the employer's withdrawal from the pension plan, but the

liability is an obligation to insure the payment of vested benefits, benefits which have accrued prior to withdrawal even though the benefits may not be payable until a future date. *Trustees of the Amalgamated Insurance Fund v. McFarlin's, Inc.*, 789 F.2d at 101–102; *In re Pulaski Highway Express, Inc.*, 57 B.R. at 507; *Amalgamated Insurance Fund v. William B. Kessler, Inc.*, 55 B.R. at 738. Thus, a withdrawal claim is not the type of claim which section 502(b)(7) addresses.

Finally, the collective bargaining agreement did not provide for liability in the event that the employer withdrew from the pension plan. *C.f., In re Alan Wood Steel Company*, 4 Bankr.Ct.Dec. (CRR) at 857–859. The claim of the Pension Fund arises not from the rejection of the collective bargaining agreement,[6] but is based upon liability imposed by statute. *Connolly v. Pension Benefit Guaranty Corp.*, 106 S.Ct. 1018; *T.I.M.E.–DC, Inc. v. Trucking Employers of North Jersey Welfare Fund*, 560 F.Supp. 294, 297 (E.D.N.Y.1983); *Debreceni v. Healthco–D.G. Stoughton Co.*, 579 F.Supp. 296, 297 (D.Mass.1984); *Richland Industries v. Robbins*, 617 F.Supp. 639, 641–642 (D.C.Ill.1985). Accordingly, the withdrawal liability claim is not subject to the limitation imposed by section 502(b)(7) even if the term "employment contract" were construed to embrace collective bargaining agreements.

It may be, as the debtor maintains, that the allowance of the withdrawal claim in its entirety will thwart the debtor's ability to reorganize. Withdrawal claims in a chapter 11 may pose significant problems for a debtor. However, whether such claims should be limited is a question for Congress and not for the courts.

An order consistent with this Opinion has been entered.

---

6. In fact, the collective bargaining agreement was not terminated, it merely expired by its own terms.