**In re Paul J. BERGH and Sharon R. Bergh, Debtors.**

**Bankruptcy No. 4–91–3761.**

United States Bankruptcy Court,
D. Minnesota.

May 22, 1992.

Molly T. Shields, St. Paul, Minn., appeared on behalf of the debtors.

James A. Wellner, Minneapolis, Minn., appeared on behalf of Tom and Jean Stegall.

## AMENDED ORDER DETERMINING CLAIM # 46 AND DENYING CONFIRMATION OF PLAN

ROBERT J. KRESSEL, Chief Judge.

This case came on for hearing on the debtors' motion for determination of the value of a lien and the amount of an unsecured claim and for confirmation of the debtors' plan. Molly T. Shields appeared on behalf of the debtors, James A. Wellner appeared on behalf of Tom and Jean Stegall. This court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 201. These are core proceedings under § 157(b)(2)(B), (K) and (L). Based on the memoranda, arguments of counsel and

the file in this case, I make the following memorandum order.

## FACTUAL BACKGROUND

The debtors have operated hair care salons since 1984 through license agreements with different corporations. The debtors had several license agreements with Fantastic Sam's International Inc.

The Stegalls, the major creditors in this case, also acquired a number of salons through license agreements with Fantastic Sam's. The debtors and the Stegalls have known each other for several years.

In 1989, both the debtors' and the Stegalls' businesses were struggling. Following the advice of an attorney who represented both the debtors and the Stegalls, the debtors decided to purchase the Stegalls' businesses. In June of 1990, the debtors and the Stegalls entered into a "Memorandum of Understanding" outlining the terms of the sale. On June 30, 1990, the debtors, the Stegalls and J & T Sam's #2 Inc.[1] consummated the sale by executing a Purchase Agreement, Security Agreement, Consulting Agreement and Noncompetition Agreement.

The Purchase Agreement provided for the sale of all of the leased and owned furniture, furnishings, equipment, fixtures and supplies, referred to as "The Inventory", in addition to the leases, contracts, franchise agreements and licenses, plus, all trade names and trademarks for five hair care centers.[2] The debtors also agreed to hold the Stegalls harmless for and assume certain leases, contracts and other liabilities including the real estate leases for the purchased business locations, an equipment lease with Stephens Diversified and leases for some signs. The Purchase Agreement also contemplated that the debtors would reimburse the Stegalls for any deposits that would be released after the sale. The Purchase Agreement refers to and incorporates certain schedules but no one has copies of these schedules.

The agreement provided that the debtors were to pay a total of $112,500.00[3] for the purchase of all the assets excluding the inventory. The purchase price for the inventory was to be determined by the sellers' actual cost for such items. After the parties determined the purchase price for the inventory, the debtors were to make three equal payments with the final payment on October 1, 1990.[4]

The Security Agreement secured payment of indebtedness in a total amount of $195,000.00[5] and "any and all other liabilities of Debtor to J & T SAM'S #2 INC.". The Security Agreement provided:

## II. GRANT OF SECURITY INTEREST

As security for all Liabilities, the Secured Party is hereby granted, and shall have a security interest, in the following:

A. The Collateral;[6]

1. All of the relevant agreements were signed by or on behalf of Bergh Inc., and Paul and Sharon Bergh and J & T Sam's #2 Inc., and Tom and Jean Stegall. For purposes of this order, I will refer to J & T Sam's #2 Inc., and Tom and Jean Stegall simply as the Stegalls.

2. Although the Purchase Agreement does not specifically refer to the five hair care centers, it is apparently understood, as reflected in an attachment to the financing statement, that the five hair care centers are located at:
   1. 8040 Brooklyn Boulevard, Brooklyn Park, MN;
   2. 3050 Brookdale Drive, Brooklyn Park, MN;
   3. 10905 Douglas Drive, Champlin, MN;
   4. 9350 Lexington Avenue, Lexington, MN; and
   5. 1555 W. Larpenteur, Falcon Heights, MN.

3. The agreement provided that debtors establish a $2,500.00 escrow and pay the Stegalls $10,-000.00 at the time of closing. The remaining $100,000.00, together with 10% interest per annum, would be paid through 96 monthly installments of $1,517.70 as fully outlined in the Cognovit Promissory Note the Berghs signed.

4. Although it is not clear from any of the memoranda, it appears that the Stegalls are not asserting a claim for unpaid inventory payments. It may be that the debtors were successful in completing the payments for the inventory prior to their present financial difficulties.

5. There is no indication as to what amounts make up the total indebtedness of $195,000.00.

6. The term Collateral refers to all of the equipment described in Exhibit A. Apparently, neither party has a copy of the Exhibit A. The Security Agreement does define equipment as "all goods, merchandise, and other personal

B. All goods, instruments, documents of title, policies and certificates of insurance, chattel paper, deposits, money or other property now, or hereafter owned by Debtor or in which Debtor now has or hereafter acquires an interest, whether or not same represents, evidences or relates to The Collateral; and

C. The proceeds and products of all of the foregoing items described in A. and B. of this Section II.

The Security Agreement also contained provisions for the debtors' representations, covenants and warranties, events which would constitute default and the secured party's rights upon default.

The Consulting Agreement provided that the Stegalls would provide consulting services to the debtors with respect to the businesses the Stegalls sold to the debtors. The agreement provided that the Stegalls would provide no more than 120 hours of service per year for 99 months. The debtors were to pay a total of $41,800.00 [7] as consideration for the consulting services. The Consulting Agreement provided, among other things, that:

B. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, successors, and assigns.

.    .    .    .    .

E. This Agreement shall survive the death of the consultant.

Finally, the Noncompetition Agreement provided that for five years after July 1, 1990, the Stegalls shall not:

[D]irectly or indirectly own, manage, operate, control, be employed or retained at, act as consultant or advisor to, render any services for, have any financial interest in or otherwise be connected in any manner with the ownership, management, operation, or control or any person, firm, partnership, corporation, or other

entity ("Person"), which is engaged in the operation of a hair care salon.

Payments in consideration for the promises in the Noncompetition Agreement amounted to a total of $110,000.00.[8]

On July 1, 1990, the debtors signed a Cognovit Promissory Note to pay J & T Sam's # 2 Inc., a principal amount of $100,000.00 plus interest at 10% per annum through 96 monthly installments of $1,517.70.

The Stegalls perfected their security interest on July 10, 1990, by filing a financing statement with the Secretary of State. The financing statement provided:

4. This financing statement covers the following types (or items) of property:

The actual business known as Top Performance, together with all goodwill, trade name and all other property of every kind, nature and description, including goods and accounts, inventory, supplies, fixtures, and equipment now owned hereafter acquired by Debtor in connection with the operation of Debtor's business. Debtor will not sell or otherwise transfer or encumber the property, nor allow a transfer of its ownership interest in said business without the prior written consent of the Secured Party. This Financing Statement also includes all items set forth, or kept at any locations set forth, on any schedules or exhibits attached hereto.[9]

In March of 1991, the debtors' businesses suffered. The debtors were unable to pay the Stegalls as required under the Purchase Agreement, Consulting Agreement and Noncompetition Agreement. The debtors and Stegalls were unable to negotiate a resolution of the debtors financial problems. On May 23, 1991, the Stegalls brought a motion for replevin in Ramsey County District Court. The court entered

property which is used or bought primarily for use in Debtor's business or profession."

7. The agreement provided that the debtors pay the Stegalls $6,250.00 upon execution of the agreement and 96 monthly installments of $370.32 to pay the balance of $35,550.00.

8. The agreement provided that the debtors pay the Stegalls $6,250.00 upon execution of the agreement, 96 monthly payments of $950.52 and $12,500.00 on October 1, 1998, to pay the balance of $103,750.00.

9. *Supra* n. 1.

Order for Possession Pursuant to Minn. Stat. § 565.23 on May 30, 1991.

The debtors filed this chapter 11 case on May 31, 1991. The debtors continue to operate their businesses as debtors in possession. At the end of July 1991, the debtors rejected five real estate leases. Three of these five leases were leases for stores purchased from the Stegalls.[10] The debtors also assumed six real estate leases for stores, two of which were purchased from the Stegalls.[11]

The Stegalls sought relief from the automatic stay on August 8, 1991. They asserted a security interest in all 10 of the debtors hair salons and argued their interest was not adequately protected. The debtors objected to the Stegalls' motion but later stipulated to adequate protection payments of $1,000.00 per month and termination of the stay as to

> any equipment, fixtures, furnishings or other assets in which the estate has an interest which may be located at the following store locations which have been closed by the estate: 9350 Lexington Avenue, Circle Pines, Minnesota; 3050 Brookdale Drive, Brooklyn Park, Minnesota; 1290 West Frontage Road, Stillwater, Minnesota; 1694 Suburban Avenue, St. Paul, Minnesota; and 1555 Larpenteur Avenue, Falcon Heights, Minnesota.

On January, 2, 1992, the Stegalls filed a proof of claim for $264,367.68, as a secured claim. The Stegalls attached copies of the Purchase Agreement, Security Agreement, Consulting Agreement, Noncompetition Agreement, Cognovit Promissory Note and the Financing Statement as evidence of

10. The three rejected leases included:
1. 9350 Lexington Avenue, Circle Pines, MN;
2. 3050 Brookdale Drive, Brooklyn Park, MN; and
3. 1555 Larpenteur Avenue, Falcon Heights, MN.

11. These two leases included:
1. 8040 Brookdale Drive, Brooklyn Park, MN; and
2. 10905 Douglas Drive, Champlin, MN.

12. In the Stegalls' Response to Debtors' Objection to Claim, the Stegalls provide some, albeit incomplete, information. The Stegalls assert that the debtors are indebted in the following amounts:

their claim. A breakdown of the amounts owed for each of these agreements, which would have been extremely helpful, was not provided with the claim.[12]

The debtors' plan and disclosure statement were filed and amended. The debtors' second amended plan of reorganization classifies the Stegalls' claim as follows:

1. *Class A* consists of the allowed secured claim of Tom and Jean Stegall ("Stegalls"), who allegedly hold a security interest in certain of Debtors' assets. The extent and amount of that security interest is disputed. It is anticipated that an adversary proceeding will be commenced by the Berghs against the Stegalls to determine if the Stegalls have a valid lien and to determine if they received a fraudulent conveyance. If successful, Stegalls may not have a secured claim.

5. *Class E* consists of all allowed unsecured claims, including the unsecured portion of the Stegalls' claim and all damage claims arising from the Debtors' rejection of executory contracts.

The debtors' plan proposes the following treatment of the Stegalls' claim:

2. *Class A.* This class consists of the allowed secured claim of the Stegalls. The Stegalls' asserted claim totals in excess of $100,000.00 and has been subject to dispute, both as to the amount of the claim and the extent of their secured lien. For purposes of the Plan, Debtors propose the following settlement. Stegalls shall have an allowed secured claim in the amount of

Promissory Note $106,135.79;
Consulting Agreement $33,500.48;
Noncompetition Agreement $95,195.32;
Proof of Claim $21,458.66;
Alleged Liability to Lessors $10,700.00;
Equipment Leases $14,227.19;
Security Deposits $2,723.19.
The Stegalls deducted $14,227.19 for the amount received as consideration for the transfer of the equipment subject to the Stegalls' security interest which had been foreclosed upon, mentioned $1,500.00 received as payment on their secured claim and asserted the amount of their current claim to be $257,513.44 plus interest.

$35,000 based upon the appraisal of the value of the equipment. This will be paid over a five-year period with an 8% rate of interest. Monthly payments will be approximately $710. The Stegalls' secured claim is impaired. The Stegalls shall retain their lien on all the Berghs' business assets until paid in full if it is determined that they have a secured claim.

The undersecured portion of Stegalls' claim will be placed in Class E, and will be treated the same as the other creditors' claims in Class E. Portions of Stegalls' claim overlaps with claims involving executory contracts rejected under the Plan.

6. *Class E* consists of all holders of other allowed unsecured claims, including the undersecured claim of the Stegalls.

Each holder of a Class E claim shall be paid quarterly over five years out of excess cash flow. Excess cash flow is the profits of the business after payment of all business expenses. Estimated excess cash flow is set out in the projections attached to the Disclosure Statement. The first quarterly payment will be made three months after the Effective Date of the Plan. Each Class E claimant will be paid up to 30% of its allowed claim. It is estimated that the Berghs will make the following maximum distributions to unsecured creditors on an annual basis: Year One—$32,900; Year Two—$24,300; Year Three—$24,000; Year Four—$33,200; Year Five—$37,300. Class E is impaired under the Plan.

The plan classifies the Consulting Agreement and the Noncompetition Agreement as executory contracts and provides for rejection of these contracts. The plan provides for any claims arising from the rejection of these contracts to be treated as an unsecured claim under Class E. The debtors intend to fund their plan through continued operations of their existing hair care salons.

The disclosure statement was approved on January 28, 1992, and the confirmation hearing was set. Prior to the debtors' confirmation hearing, the debtors filed a motion to determine the amount of the Stegalls' secured claim and the amount of their unsecured claim. For the purpose of this motion, the debtors do not dispute the existence of the Stegalls' lien. The debtors assert that the amount of the Stegalls' secured claim is $35,000.00 and that their unsecured claim is $62,000.00.

The debtors arrive at these numbers by arguing, first, that in determining the amount of the Stegalls' secured claim, the court should consider the fair market "in place" value of the equipment and furnishings. The debtors assert, according to their appraisal, that the "in place" value of the equipment and furnishings is between $30,000.00—$35,000.00. Second, the debtors argue that the Stegalls' claim under the Consulting Agreement is unsecured and should be limited to $4,431.00 as an employment contract under 11 U.S.C. § 502(b)(7). Third, the debtors argue that the Stegalls are not entitled to a claim arising from the Noncompetition Agreement. The debtors argue that since they rejected the agreement under the plan, the Stegalls are free to compete and, therefore, they have not suffered any damages through the rejection of the Noncompetition Agreement.

The Stegalls objected to the debtors' motion. They presented their own appraisal that estimates the fair market value of the debtors' business to be between $155,000.00—$215,000.00. The Stegalls also argue that their claims under the Consulting Agreement and the Noncompetition Agreement should not be limited. The Stegalls assert that the debtors cannot unilaterally reject the contracts and that, even if the debtors can unilaterally reject the contracts, the debtors are not the sole party to the agreements, therefore, the rejection does not terminate the agreements with Bergh Inc.

On March 4, 1992, the court held a hearing on the debtors' motions and the Stegalls' objections. Neither party offered testimony or additional exhibits at the hearing, both parties believing they had sufficiently briefed the issues in their motion

papers. The matter was taken under advisement.

One week later, confirmation of the debtors' plan was taken under advisement pending resolution of the debtors' motion to determine the value of the Stegalls' lien and the amount of their unsecured claim.

## DISCUSSION

In order to determine the amount of the Stegalls' secured claim, and whether the debtors' plan can be confirmed, I must first determine the amount of the Stegalls' claim, and whether and to what extent the claim is secured. Only after this analysis will I be in a position to determine if the debtors' plan is confirmable.

## THE STEGALLS' TOTAL CLAIM

To begin this analysis, I need to determine the amount of the Stegalls' claim. 11 U.S.C. § 1111(a), provides that a proof of claim is deemed filed for all claims that are listed in the debtors' schedules except for claims that are listed as disputed, contingent, or unliquidated. Under 11 U.S.C. § 502(a), a claim is deemed allowed unless a party in interest objects. After notice and hearing, the court is to determine the amount of the claim as of the date the petition was filed. 11 U.S.C. § 502(b). Federal Rules of Bankruptcy Procedure 3001(f) provides:

> **Evidentiary Effect.** A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.

Fed.R.Bankr.P. 3001(f).

The debtors listed the Stegalls' claim as a disputed claim for an undetermined amount. On January 2, 1992, the Stegalls filed a proof of claim in the amount of $264,367.68, as a secured claim. The Stegalls attached copies of the Purchase Agreement, Security Agreement, Consulting Agreement, Noncompetition Agreement, Cognovit Promissory Note, and Financing Statement as evidence of their secured claim. A breakdown of the amounts owned under each agreement was not provided with the proof of claim.

In the debtors' motion to determine the amount of the Stegalls' secured claim, the debtors objected to portions of the Stegalls' claim. The Stegalls, in their response to the debtors' objection to the claim, outlined the amounts of indebtedness that make up their claim. The Stegalls assert that their claim is secured and that the debtors are indebted to them in the following amounts:

Promissory Note $106,135.79;
Consulting Agreement $33,500.48;
Noncompetition Agreement $95,195.32;
Proof of Claim $21,458.66;
Alleged Liability to Lessors $10,700.00;
Equipment Leases $14,227.19;
Security Deposits $2,723.19.
    Total $283,940.63

The Stegalls then deducted $14,227.19 for the amount received as consideration for the transfer of the equipment subject to the Stegalls' security interest that was foreclosed. The Stegalls also deducted $1,500.00 as payment received on their secured claim. Although these numbers do not add up to the amount of the claim as filed, $264,367.68, the Stegalls assert that the current claim is $257,513.44. The debtors have offered no evidence to contradict or discredit these numbers.

For the purpose of determining the amount of the Stegalls' claim, I accept the amounts the Stegalls have set forth as the amounts due for the Promissory Note, Consulting Agreement and Noncompetition Agreement.

A. Cognovit Promissory Note. The amount due under the Promissory Note for the purchase of assets appears to be uncontested. Since the debtors have not presented evidence that the amount the Stegalls assert under the promissory note is inaccurate, I will accept $106,135.79 as the amount due under the promissory note.

B. Consulting Agreement. The debtors argue that the amount of the Stegalls' claim for the Consulting Agreement should be limited to $4,431.00, as an employment contract within the purview of 11 U.S.C. § 502(b)(7). The Stegalls argue the Consulting Agreement is not an employment contract that has been terminated, there-

fore, the § 502(b)(7) limitation should not be applied to their claim.

If a party objects to a claim, 11 U.S.C. § 502(b)(7) provides that after notice and hearing, the court shall determine the amount of the claim, as of the date of the filing of the petition, and allow the claim in that amount except to the extent that:

(7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds—

(A) the compensation provided by such contract, without acceleration, for one year following the earlier of—

(i) the date of the filing of the petition; or

(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

(B) any unpaid compensation due under such contract without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b)(7). Section 502(b)(7) acts as a statutory cap to limit employment related claims based on the future compensation an employee would have received had the contract not been terminated. *In re Johnson,* 117 B.R. 461, 465 (Bankr. D.Minn.1990).

The debtors assert that the Consulting Agreement qualifies as an employment contract under § 502(b)(7) and should be limited to $4,431.00 to compensate the Stegalls under the contract for one year from the date the debtors filed their petition. The Stegalls argue that the debtors' rejection of the consulting agreement cannot terminate the agreement because Bergh Inc. was a party to the agreement. This argument is irrelevant for purposes of this motion. Bergh Inc. is not a debtor in this case. I do not need to decide whether the consulting agreement continues to be binding on Bergh Inc.

The issue before the court is whether the Consulting Agreement constitutes an employment contract. Courts have looked to a variety of factors to determine if an agreement qualifies as an employment contract to limit employee claims under § 502(b)(7). Factors that evidence an employment contract include: a written agreement; how the agreement is entitled; if the agreement identifies job responsibilities; if the agreement provides the terms for compensation and benefits; if withholding taxes and social security are deducted from compensation; if the "employee" is precluded from certain other activities; if the agreement is not assignable; if the agreement ceases when a party dies; and provisions for terminating the agreement. *See In re Aero–Auto Co.,* 33 B.R. 107 (Bankr.E.D.Va.1983); *In re The Charter Co.,* 82 B.R. 144 (Bankr.M.D.Fla.1988); and *In re Johnson,* 117 B.R. 461 (Bankr. D.Minn.1990).

In this case, the Consulting Agreement covers many of these factors which evidence an employment contract, however, there are several significant differences. The debtors and the Stegalls did enter into a written agreement entitled Consulting Agreement but the agreement does not identify job responsibilities. The agreement only provides that the Stegalls, as consultants, will consult with the debtors about the businesses the Stegalls sold to the debtors. The agreement limits the consulting services to a maximum of 120 hours per year. The agreement includes a lump sum compensation term but does not provide for any other benefits or for withholding taxes or social security. The agreement is limited to a term of 99 months during which the debtors are to make monthly installments to pay the balance of the amount due under the agreement. Most importantly, the agreement provides that it "shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, successors, and assigns" and that the agreement shall survive the death of the consultant. With such provisions, it is obvious this Consulting Agreement was not intended as an employment contract. The Consulting Agreement was one method the debtors and the Stegalls used to increase the total amount the Stegalls would receive for the sale of their business.

Employment contracts provide for compensation, benefits, tax and social security withholdings, and generally do not allow for the contract to be assigned or to survive the death of the employee. It would be incongruous to find that this Consulting Agreement satisfied the requisite elements to qualify as an employment contract. Therefore, I find that the Consulting Agreement is not an employment contract subject to the statutory cap of § 502(b)(7). Since the Stegalls assert, without objection from the debtors, that $33,500.48 is due under the Consulting Agreement, I will accept $33,500.48 as the amount of the Stegalls claim under the Consulting Agreement.

C. Noncompetition Agreement. The debtors argue that the Stegalls are not entitled to any money arising out of the noncompete agreement. The Stegalls assert that $95,195.32 is due under the Noncompetition Agreement. The debtors argue that since the plan treats the Noncompetition Agreement as a rejected executory contract, the Stegalls are free to compete with the debtors' business. The debtors believe that the Stegalls have suffered no damages from the rejection of the agreement and that the Stegalls have already begun to compete with the debtors' business. The Stegalls counter these allegations with a general denial that the agreement has been properly rejected and that they have breached the agreement.

Most of these arguments are irrelevant. If the Noncompetition Agreement is not an executory contract, then the Stegalls have a simple claim for the unpaid payments. If it is an executory contract, which the debtors are rejecting in their plan, then the measure of the Stegalls' damages is still the unpaid payments.

There are no facts to support the debtors allegations that the Stegalls have in some manner breached the Noncompetition Agreement. Hence, the appropriate measure of damages is the unpaid amount under the contract. The Stegalls allege that

the unpaid amount is $95,195.32. The debtors have not provided any evidence to rebut this amount, therefore, I accept $95,195.32 as the amount of the Stegalls' claim under the Noncompetition Agreement.

D. Equipment Leases. I also accept the Stegalls' claim for the liability for the equipment leases in the amount of $14,227.19. Although the Stegalls did not provide information related to these claims in their proof of claim, they did provide this information in their verified Response to Debtors' Objection to Claim. In addition, the debtors' liability for obligations arising from the equipment leases was expressly included in the terms of the Purchase Agreement. Again, the debtors presented no evidence to discredit or contradict the Stegalls' allegations of the amounts due for their liability for equipment leases. Therefore, I accept the Stegalls' claim for the equipment leases is $14,227.19.

E. Alleged Liability to Lessors and Security Deposits. The Stegalls also assert that they have a claim for $10,700.00 for alleged liability to lessors and $2,723.19 for security deposits. The Purchase Agreement provided that the debtors would assume the obligations for the real estate leases for the salons which they purchased. The Purchase Agreement also provided that the debtors would reimburse the Stegalls for utilities or leasehold premises deposits when those deposits are returned to the debtors. Although the debtors have not denied liability for the lease obligations and security deposits, it is unclear if the Stegalls have a claim for these obligations. There was no evidence included in the proof of claim for either the lease liability or security deposits. The Stegalls' verified Response to Debtors' Objection to Claim lists the lease liability as an *alleged* liability to lessors. In their response, it appears that the Stegalls did not include the $10,700.00 alleged lease liability in the calculations for the current amount of their claim.[13] Additionally, the alleged lease liability amount presumably includes any

---

**13.** If $10,700.00 is subtracted from the $283,940.63 total, along with the deductions the Stegalls allowed, the total equals $257,513.44, which is the same amount of the Stegalls' current claim.

damages suffered as a result of the loss of any security deposits. Since there is no evidence to support the claims, I will not allow the Stegalls' claim for the amounts of the alleged lease liability or the security deposits.

F. Proof of Claim. In the Stegalls' response to the debtors' motion, the Stegalls assert that $21,458.66 is due for "proof of claim". There is no indication as to what the Stegalls mean by "proof of claim". There was no evidence included in the proof of claim for this amount and there was no mention of "proof of claim" or $21,458.66 in the Stegalls' memorandum in opposition to the debtors' motion. Therefore, I will disallow the claim for $21,458.66.

The Stegalls deducted $14,227.19 as credit for the amount received for the transfer of equipment that was foreclosed and $1,500.00 for payment received on their secured claim. I find these deductions appropriate. The Stegalls' allowed claim consists of the following:

Promissory Note $106,135.79;

Consulting Agreement $33,500.48;

Noncompetition Agreement $95,195.32; and

Equipment Leases $14,227.19

From this total I have deducted $14,227.19 and $1,500.00. Accordingly, the total amount of the Stegalls' allowed claim is $233,331.59.

### EXISTENCE OF THE STEGALLS' SECURED CLAIM

■ Now that I have determined that the amount of the Stegalls' claim is $233,331.59, I must determine whether the claim is secured.

Minnesota statutes basically provide that a security interest is not enforceable unless the debtors signs a security agreement which contains a description of the collateral, value is given and the debtor has rights in the collateral. Minn.Stat. § 336.9–203(1). In this case, the parties negotiated and executed a Security Agreement. The debtors granted the Stegalls a security interest in all of the assets that were sold, general intangible, and "other property now or hereafter owned by Debtor or or in which Debtor now has or hereafter acquires an interest, whether or not same represents, evidences or relates to The Collateral." If read literally, the security agreement covers all of the debtors property. However, since there is no evidence that the literal interpretation was actually intended, it is fair to presume that the parties intended that only the debtors' *business* property secure all obligations under the security agreement. In fact, in their memorandum the Stegalls concede that the Security Agreement applies only to the debtors' stores and all the property used in connection with the debtors' business. The Security Agreement was executed to secure payment of the promissory note and all other liabilities of the debtor incurred in the purchase of the Stegalls' businesses. The debtors paid cash down and executed a promissory note for the balance of the purchased assets, and made monthly installments for the balance of the Consulting Agreement and the Noncompetition agreement. At that point, the debtors had rights in the collateral and the security interest became enforceable. Therefore, I find that the Stegalls' claim is secured.

The Stegalls filed a financing statement on July 10, 1990, to perfect their security interest. *See* Minn.Stat. § 336.9–302. The financing statement perfected the Stegalls' security interest in all of the debtors' business assets including all items kept at all locations listed. Attached to the financing statement is a list of locations where the collateral is kept. But, perfection is not imperative at this time. In fact, I do not need to determine what is important, for even if the Security Agreement is not perfected, the lien, perfected or not, exists until the debtors take steps to avoid the lien.

### AMOUNT OF THE SECURED CLAIM

Finally, I arrive at the point at which I must determine the amount of the Stegalls' secured claim. Although both parties submitted appraisals of the collateral, neither party offered any testimony regarding the appraisers' qualifications, the appraisers'

methodology or the basis for the numbers in the appraisal. The only factor both appraisers agreed on is that the court should use the fair market value, rather than a liquidation value, to determine the value of the collateral.

■ Determining the value of the collateral is a question of fact. 11 U.S.C. § 506(a) provides:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest, ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a).

■ The key phrase in § 506(a) is "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property...." 11 U.S.C. § 506(a). This phrase is important because there is no fixed method to determine the value of collateral. The legislative history of § 506(a) makes it clear that valuation is to be determined on a case-by-case basis focusing on the use of the property.

'Value' does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it always imply a full going concern value. Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interest in the case.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977), reprinted in 5 U.S.Code Cong. & Admin.News 5963, 6312 (1978).

While courts will have to determine value on a case-by-case basis, the subsection makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of the subject property.

S.Rep. No. 95–989, 95th Cong., 2nd Sess. (1978), reprinted in 5 U.S.Code Cong. & Admin.News 5787, 5854 (1978).

The debtors admit that they intend to keep the equipment and furnishings in their hair care salons so as to continue to operate the salons, but it does not appear that this was taken into consideration in their appraisal. The debtors argue that a "fair market 'in place' value" is the appropriate method to value the Stegalls' secured claim. The debtors' appraisal estimates the "in place" value of the debtors' equipment and furnishings is between $30,-000–$35,000. The appraisal consists of nothing more than several invoice pages that list the debtors' equipment and furnishings at each of the debtors' hair care salon locations. The invoice pages also contain information about the quantity and suggested retail value of the equipment and furnishings.

The appraiser's valuation method encompassed appraising the items in the debtors' stores at the "suggested retail value of the described salon equipment warehoused. The liquidation value would be 30% to 50% of the listed prices. All the equipment described is 'used sold as is' no warranty unless otherwise noted." Debtors' appraisal p. 1.

The debtors argue that the value of the collateral should not be based on an income stream analysis. The debtors argue that the Stegalls only have a lien on the equipment and furnishings not a lien on the stores.

The Stegalls argue the proper valuation method should be based on a "going concern" fair market value analysis. The Stegalls' appraisal is not limited to the value of the individual pieces of equipment and furnishings.

The Stegalls' appraisal relies primarily upon the debtors' goodwill and the asset value. The appraiser defined goodwill as "the expectation of continued patronage of an established, going business, and usually results in the business earning profits beyond a reasonable return on all the other assets of the business." Stegalls' apprais-

al p. 2. According to the Stegalls' appraisal, the fair market value equals goodwill + asset value. Goodwill equals 2–3 × earnings. The appraiser determined, without any explanation of his methodology, that the adjusted earnings amounted to $60,-000.00. The appraiser incorporated the debtors' highest asset value number of $35,000. Based on the Stegalls' appraisers' numbers, the appraisal value equals goodwill of $120,000–$180,000 plus asset value of $35,000 totalling a going concern value of $155,000–$215,000.

Since there is such disparity between the parties as to the value of the collateral, the valuation method is important. The debtors intend to continue to use the collateral to operate the business they purchased from the Stegalls. Going concern value is "the amount that a willing buyer would pay for the assets with a view to continuing to operate the assets as an integrated, income-producing enterprise." *In re Wabash Valley Power Ass'n,* 77 B.R. 991, 1005 (Bankr.S.D.In.1987) *rev'd on other grounds,* 111 B.R. 752 (S.D.Ind.1990). In all likelihood, this is the concept the parties employed when the debtors bought the Stegalls' business. The Stegalls sold their salons as an integrated, income producing business. The Stegalls sold their ongoing business and the assets of the business to the debtors. This is evidenced by language in the Purchase Agreement which states, the "SELLERS desire to sell and BUYERS desire to purchase all of the business and assets of THE BUSINESS,...." Additionally, the parties entered into a Consulting Agreement which required that the Stegalls provide consulting services "with respect to the business formerly owned and operated by [the Stegalls]." They also entered into a Noncompetition Agreement which prohibits the Stegalls from directly or indirectly, owning, managing, operating or being involved with any hair care salons. Furthermore, the Security Agreement covers all liabilities of the debtor to the Stegalls, and the Financing Statement specifically provides that the actual business, including goodwill, equipment and fixtures,

are covered under the financing statement. The Stegalls have thus far received a minimal amount of the total purchase price prior to the debtors bankruptcy and now they are deprived of access to their security.

I find that since the value of the collateral depends on the use of the property, and the debtors intend to continue to use the property, that the going concern method of valuating the collateral is most appropriate. Further, I find that the value of the Stegalls' collateral and therefore the amount of their secured claim is $155,-000.00.[14] Hence, the value of the Stegalls' unsecured claim is $78,331.59, the total amount of their claim ($233,331.59) less the secured claim ($155,000.00).

## CONFIRMATION

Now that I have determined the amount of the Stegalls' secured and unsecured claims, I can deal with the issue of whether the debtors' plan is confirmable.

▉ 11 U.S.C. § 1129 contains the requirements that must be met before a court can confirm a plan. Section 1129(a)(8) requires that each class of claims or interests either accept the plan or not be impaired under the plan. 11 U.S.C. § 1129(a)(8)(A) & (B). 11 U.S.C. § 1126 outlines when a class of claims can be counted as having accepted the plan. Section 1126 provides in part:

(c) a class of claims has accepted a plan if such plan has been accepted by creditors, ... that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, ... that have accepted or rejected such plan.

11 U.S.C. § 1126(c). If the debtors are unable to meet the requirements of confirmation in § 1129(a)(8), the debtors can attempt to cram down on those unaccepting, impaired classes under 11 U.S.C. § 1129(b). In order to cram down on a class of secured claims, the plan must provide that the secured creditors retain the lien secur-

---

**14.** Considering the minimal amount of information provided to me in the Stegalls' appraisal I feel compelled to accept the lowest estimated value of the collateral.

ing their claims to the extent of the allowed amount of the claim and provide that the claim holders receive payments whose present value equals the allowed amount of the secured claim. Since the Stegalls' claim is impaired and they have not accepted the plan, in order to confirm their plan, the debtors must cram down on the Stegalls' secured claim. Although the debtors' plan provides for the Stegalls to retain their lien, it provides them with a stream of payments which has a present value of only $35,000.00. Since the Stegalls' secured claim is $155,000.00, the plan does not meet the requirements of § 1129(b)(2)(A)(i)(II). Thus, the plan may not be crammed down on the Stegalls.

■ Interestingly, even if the debtors were right about the amount of the Stegalls' secured claim, their plan could still not be confirmed. If the Stegalls secured claim was $35,000.00 as claimed by the debtors, then the plan would meet the requirements for cramming down on the Stegalls' secured claim. However, then the debtors would have problems with Class E, the class of unsecured creditors. Since the Stegalls total claim is $233,331.59, if there secured claim was $35,000.00, then they would have a $198,331.59 unsecured claim. The ballot summary filed by the debtors indicates that twenty-six creditors holding unsecured claims totalling $210,365.99 accepted the plan and one creditor with an unsecured claim of $6,563.90 rejected the plan. The Stegalls filed a ballot rejecting the plan. However, the debtors counted the ballot only in Class A, which was the class for the Stegalls' secured claim. The debtors somehow claim that since the Stegalls' ballot indicated that they were secured creditors, that their ballot cannot be counted in both classes. I know of no support for such a position. If the Stegalls have claims in two classes, they are entitled to have their ballot counted in both classes. Using the debtors' valuation, the Stegalls' unsecured claim of $198,331.59 should be counted as a rejection in Class E. This would change the balloting in Class E so that there would still be twenty-six creditors with total unsecured claims of $210,365.99 accepting, but would now reflect

two creditors with unsecured claims of $204,895.49 rejecting the plan.

■ Title 11, United States Code, § 1126(c) provides that a class has accepted the plan if more than one-half the number and two-thirds an amount vote to accept the plan. Obviously, under the debtors' scenario, the acceptance by unsecured creditors would fall far short of the two-thirds requirement which means that Class E would not have accepted the plan. Again, since Class E is impaired, the confirmation requirements found in § 1129(a)(8) have not been met and the debtors would have to turn to cramdown. To cram down on a class of unsecured claims, the plan must either pay the class in full, 11 U.S.C. § 1129(b)(2)(B)(ii):

> the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B)(ii). Since the debtors' plan does not pay the unsecured creditors in full, it cannot be confirmed unless junior claims and interests do not receive or retain property under the plan. However, the debtors themselves, whose interest in their property is junior to those of unsecured creditors, will retain their property and business, thus violating the so called absolute priority rule. Therefore, even if the debtors were right about the amount of the Stegalls' secured claim, their plan would be unconfirmable.

## CONCLUSION

The Stegalls have a total claim of $233,331.59 secured by property of a value of $155,000.00. The debtors' plan is not confirmable since it does not meet the requirements of § 1129(a) nor does it meet the cramdown requirements of § 1129(b).

THEREFORE, IT IS ORDERED:

1. Claim No. 46 filed by Tom Stegall and Jean Stegall is allowed as a secured claim in the amount of $155,000.00 and as an unsecured claim in the amount of $78,331.59.

2. Confirmation of the debtors' plan dated January 19, 1992, filed January 24, 1992, is denied.