**In re WILSON FOODS CORPORATION, Debtor.**

**Bankruptcy No. 90–40428–11.**

United States Bankruptcy Court, D. Kansas.

June 1, 1995.

Dennis R. Dow and Todd W. Ruskamp of Shook, Hardy & Bacon, Kansas City, MO, and Stutman, Treister & Glatt, Los Angeles, CA, for debtor.

Benjamin F. Mann, Price Sloan and Michael M. Tamburini of Blackwell Sanders Matheny Weary & Lombardi, Kansas City, MO, and Pat Lobello of Lamb, Morris & Lobello, Pomona, CA, for claimant Lorraine Hiday.

*MEMORANDUM OPINION* [1]

JOHN T. FLANNAGAN, Bankruptcy Judge.

Lorraine Hiday ("Hiday") filed a proof of claim for damages that arose when debtor rejected her employment contract postpetition. The question [2] is whether the claim falls within 11 U.S.C. § 502(b)(7), which limits such claims to one year's compensation

---

1. Dennis R. Dow and Todd W. Ruskamp of Shook, Hardy & Bacon, Kansas City, Missouri, and Stutman, Treister & Glatt, Los Angeles, California, appear for debtor Wilson Foods Corporation. Benjamin F. Mann, Price Sloan, and Michael M. Tamburini of Blackwell Sanders Matheny Weary & Lombardi, Kansas City, Missouri, and Pat Lobello of Lamb, Morris & Lobello, Pomona, California, appear for claimant Lorraine Hiday.

2. This proceeding is core under 28 U.S.C. § 157 and the Court has jurisdiction under 28 U.S.C. § 1334 and the general reference order of the District Court effective July 10, 1984 (D.Kan. Rule 705).

under the contract, in this case $42,000.00 according to the parties' stipulation.[3]

The text of the statute reads:

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim ... as of the date of the filing of the petition, and shall allow such claim in such amount except to the extent that—

. . . .

(7) if such claim is the *claim of an employee* for damages resulting from the termination of an *employment contract,* such claim exceeds—

(A) the compensation provided by such contract, without acceleration, for one year following the earlier of—

(i) the date of the filing of the petition; or

(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

(B) any unpaid compensation due under such contract without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b)(7) (emphasis added).

Originally, Hiday entered into an "Employment Agreement" with The Impact Group, Inc. on July 1, 1984. The Impact Group, Inc. sold substantially all of its assets to Wilson Foods Corporation ("Wilson") in 1988.[4] As part of the sale, The Impact Group assigned the Hiday agreement to Wilson on April 8, 1988.[5]

Wilson Foods Corporation, a direct subsidiary of Doskocil Companies Incorporated, is one of 19 affiliated corporations of the Doskocil group that filed voluntary Chapter 11 petitions in this district on March 5, 1990.

On December 17, 1990, Lorraine Hiday filed a $220,995.00 general unsecured proof of claim based on the Employment Agreement. Wilson objected to the proof of claim on July 22, 1991,[6] expressing its intent to reject the Employment Agreement as an executory contract either in its plan of reorganization or by motion under 11 U.S.C. § 365.

In addition to contending that Hiday's claim is limited by § 502(b)(7), Wilson also argues that if the claim is not so restricted, it should be reduced to present value.[7]

Hiday maintains that her claim falls outside the scope of § 502(b)(7) because she was an "independent contractor" and not an "employee" whose damage claim came within the statute when the debtor terminated her employment contract.[8]

### The Employment Agreement

The Employment Agreement provided that Hiday would serve as executive vice president of The Impact Group, Inc. for a term of three years—from July 1, 1984, until June 30, 1987 [9]—designated as the "Employment Period." During the Employment Period,

---

3. The parties to this claim objection have submitted the question for decision by their "Joint Submission of Debtor and Lorraine Hiday for Determination of Allowance of Claim No. WF02340" (hereinafter "Joint Submission"). The Joint Submission consists of an agreed statement of facts and issues and three exhibits. Exhibit "A" is a copy of the Hiday proof of claim with attached Employment Agreement, subsequent Assignment and Assumption, and letter confirming Wilson's assumption of Hiday's contract. Exhibit "B" is the debtor's objection to the claim and its reply to Hiday's supplemental response. Exhibit "C" is Hiday's response and supplemental response to debtor's claim objection.

4. Joint Submission at 2.

5. Assignment and Assumption dated April 8, 1988, and letter dated October 24, 1988, from

W.H. Zeigler, Employee Benefits Director of Wilson Foods Corporation, to Lorraine Hiday, attached to proof of claim, Exhibit "A" to Joint Submission.

6. Although the Joint Submission states that the objection was filed on July 22, 1992, the record reflects that it was actually filed on July 22, 1991.

7. Joint Submission at 4.

8. Lorraine Hiday's Response to Objection of Wilson Foods Corporation to Claim No. WF 02340, Exhibit "C" to Joint Submission, at 1–2.

9. Employment Agreement attached to proof of claim, Exhibit "A" to Joint Submission, at 1–2. Although by its terms, the employment contract began on July 1, 1984, it was witnessed on July 11, 1984.

Hiday was to receive an annual salary of $75,000; all benefits made available to other officers; and a $25,000 bonus, the bonus being payable annually if the company remained profitable.[10] As vice president of the company's Southern California industrial food brokerage subsidiary, Hiday worked as a full-time manager of operations.[11]

The Employment Period was subject to renewal, but if not renewed, Hiday was to serve as a consultant for a period of seven years after the Employment Period expired, a term designated as the "Consulting Period." [12] During this period, Hiday was to receive consulting fees of $34,000 per year payable monthly, increasing each year (for a maximum of five such years) by $2,000 per year. In fact, Hiday started the seven-year Consulting Period when the Employment Period expired on June 30, 1987. During the Consulting Period, the agreement obligated Hiday to advise and consult with the officers of the company as requested; however, Hiday was to provide these services not less than three days per calendar month and not more than fifty days per year.[13]

The agreement labeled the consulting fee as self-employment income and specifically delegated the responsibility for estimating and paying federal and state taxes to Hiday. Hiday had no authority to act as an agent of the company during the Consulting Period, except when specifically authorized. She had no authority to direct the work of any company employee, and in turn, the company agreed not to control or direct the performance of her consulting services.[14]

The agreement also conditioned Hiday's right to receive consulting fees on compliance with both non-disclosure and non-compete clauses.[15] The non-disclosure provision prohibited Hiday from using or releasing any confidential business information she obtained through her employment or consulting activities.[16] For a period of seven years from the end of the Employment Period, she could not participate in the industrial food brokerage business and could not render services for any business competitor within specified territories.[17] Finally, the agreement was assignable only in the event that another company acquired all or substantially all of The Impact Group's assets.[18]

This assignment occurred with Wilson's purchase of the assets of The Impact Group in 1988. In connection with the transaction, Wilson assumed Hiday's Employment Agreement, effective April 8, 1988. This occurred after the Consulting Period began on July 1, 1987.

Ultimately, Wilson rejected the employment contract when its plan of reorganization was confirmed on September 26, 1991. At that time, Hiday's consulting fee under the contract amounted to $42,000 per year, as conceded in the stipulation of the parties.[19]

■ Whether the consulting contract is an "employment contract" within the meaning of § 502(b)(7) is the focus of decision. Hiday argues that the term "employment contract" is restricted to "employees" as defined under agency law.

**10.** Employment Agreement attached to proof of claim, Exhibit "A" to Joint Submission, at 3–5.

**11.** Employment Agreement attached to proof of claim, Exhibit "A" to Joint Submission, at 2.

**12.** Joint Submission at 2; Employment Agreement attached to proof of claim, Exhibit "A" to Joint Submission, at 2.

**13.** Employment Agreement attached to proof of claim, Exhibit "A" to Joint Submission, at 2.

**14.** Employment Agreement attached to proof of claim, Exhibit "A" to Joint Submission, at 2–3.

**15.** Employment Agreement attached to proof of claim, Exhibit "A" to Joint Submission, at 5–7.

**16.** Employment Agreement attached to proof of claim, Exhibit "A" to Joint Submission, at 7.

**17.** Employment Agreement attached to proof of claim, Exhibit "A" to Joint Submission, at 7–8.

**18.** Employment Agreement attached to proof of claim, Exhibit "A" to Joint Submission, at 11–12.

**19.** Employment Agreement attached to proof of claim, Exhibit "A" to Joint Submission, at 3–5. There are some discrepancies between the stipulation and the contract on time periods and amount of consulting fees due on the rejection date. However, since the parties have stipulated that the amount due upon rejection was $42,000.00 if the statutory limits apply, the Court will follow the stipulation.

## The Statute

In its original form under the 1978 Act, the statute was designated § 502(b)(8).[20] It read in part: "if such claim is for damages resulting from the termination of an employment contract...." Additional language was added to the subsection in 1984, making it read: "if such claim is *the claim of an employee* for damages resulting from the termination of an employment contract...."[21] (Emphasis added.)

The only legislative history under the statute predates the 1984 additions. It states:

Paragraph (8) is new. It tracks the landlord limitation on damages provision in paragraph (7) for damages resulting from the breach by the debtor of an employment contract, but limits the recovery to the compensation reserved under an employment contract for the year following the earlier of the date of the petition and the termination of employment.[22]

H.R.Rep. No. 595, 95th Cong., 1st Sess. 354 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 64 (1978).

The landlord limitation on damages to which § 502(b)(8) is compared in the quotation appeared in § 502(b)(7) of the 1978 Act. According to the legislative history, the landlord damage limitation was "designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate." *Id.*

By its terms, present subparagraph (7) of § 502(b) is limited to a fairly small class of persons—those able to secure personal service employment contracts. By comparison, subparagraph (6) is limited to "true leases." Succinctly stated, these limitation provisions work little hardship because the "landlord can lease the real property to others, and the employee can find other work." *Folsom v. Prospect Hill Resources, Inc. (In re Prospect*

*Hill Resources, Inc.), 837 F.2d 453, 455 (11th Cir.1988).*

One commentator states that the phrase "the claim of an employee" was added in the 1984 amendments for clarity "and to eliminate the possibility that some third party, such as a dependent of a former employee or a third-party contractor might assert a claim hereunder." *Norton Bankruptcy Code Pamphlet 1994–1995 Edition (Revised)* § 502(b) Editor's Comment at 379 (1995).

In *Prospect Hill,* the court stated that "[o]ne purpose of section 502(b)(7) was to relieve bankrupt employers of the continuing duty to pay high salaries to officers and owner-managers who had been able to exact favorable terms of tenure and salaries while the business prospered." This theme was reiterated in *Matter of Gee & Missler Services, Inc.,* 62 B.R. 841, 844 (Bankr. E.D.Mich.1986), when the court said, "Section 502(b)(7) was designed, as commonly assumed, to limit the claims of key executives—employees, who for one reason or another, were able to exact long-term contracts calling for substantial remuneration."

Thus, the central purpose underlying both § 502(b)(6) and (7) is to strike a fair balance between claimant-creditors who have secured long-term contracts resulting in large unsecured claims and the claims of numerous other unsecured creditors seeking pro rata payment from the all-too-often meager assets left for unsecured creditor distribution.

## The Cases

The parties cite three cases dealing specifically with whether agreements for "consulting services" are employment contracts under § 502(b)(7)—*Kopolow v. P.M. Holding Corp. (In re Modern Textile, Inc.),* 28 B.R. 181 (Bankr.E.D.Mo.1983); *In re The Charter Co.,* 82 B.R. 144 (Bankr.M.D.Fla.1988); *In re Bergh,* 141 B.R. 409 (Bankr.D.Minn.1992).

**20.** In the 1978 Act, the numbering was § 502(b)(8). Section 502(b) has been renumbered since the 1984 Amendments. The legislative history of the House and Senate under the 1978 Act refers to paragraph 8 and 7, respectively. The current, post 1984, paragraph numbers are 7 and 6, respectively.

**21.** *The Bankruptcy Amendments and Federal Judgeship Act of 1984,* Pub.L. 98–353, § 445(b)(7)(A), 98 Stat. 333, 373 (1984).

**22.** *Supra* n. 19.

The first case, *In re Modern Textile, Inc.*, provides little analytical assistance. Although it deals specifically with a consulting agreement arising from the sale of a business, the court assumed without comment, that the statute operated to limit the claim of the consultant who had secured a eight-year consulting contract with the debtor.

The other two consulting services cases, while they arrive at different final results, do not turn on the employee-independent contractor distinction advanced by Hiday. Instead, they focus on whether the contract at issue created an "employment relationship" as distinguished from other legal relationships.

In *In re The Charter Co.*, 82 B.R. 144 (Bankr.M.D.Fla.1988), the court applied the statutory cap to the claim of an attorney who entered a "Consulting Agreement" with the debtor to provide services on Middle Eastern business affairs over a six-year period. The agreement provided that the attorney would receive a first-year salary of $150,000, with an annual salary of $70,000 thereafter.[23] It prohibited assignment of the contract and contained a limited non-compete clause restricting the consultant from representing any parties in litigation with interests adverse to the debtor.[24] In considering this agreement, the court stated that "[a]n agreement is an 'employment contract,' within the purview of 11 U.S.C. § 502(b)(7), if it establishes the terms and conditions of an employment relationship."[25] The court found that the titling of the agreement as a "Consulting Agreement," the non-compete clause, and the non-assignability provision evidenced an employment relationship, thus subjecting the agreement to the limitations of § 502(b)(7).[26] Although the court did not mention the attorney-consultant's status as an independent contractor, the non-compete clause of the agreement leaves little doubt that the attorney was free to offer his services to others on

matters outside the scope of the non-compete provision.[27]

Hiday relies on the third case, *In re Bergh*, 141 B.R. 409 (Bankr.D.Minn.1992), which is the only case decided after the statutory change adding the words "the claim of an employee."

Although holding that the consulting agreement at issue was not an employment contract under § 502(b)(7), the case identified the following factors taken from other cases that evidence an employment contract under § 502(b)(7):

> a written agreement; how the agreement is entitled; if the agreement identifies job responsibilities; if the agreement provides the terms for compensation and benefits; if withholding taxes and social security are deducted from compensation; if the "employee" is precluded from certain other activities; if the agreement is not assignable; if the agreement ceases when a party dies; and provisions for terminating the agreement.[28]

In *Bergh*, two claimants entered a "Consulting Agreement" in connection with the sale of their businesses to the debtor.[29] In return for services not to exceed 120 hours per year, the consultants were to receive $6,250.00 on execution of the agreement and 96 monthly payments of $370.32 thereafter.[30] The agreement was to "be binding upon and inure to the benefit of the parties hereto, their respective heirs, successors, and assigns,"[31] and survive the death of the consultants. The facts of *Bergh* suggest that the consultants were not "employees" as that term is defined under agency principles.

The *Bergh* court acknowledged that many of the identified factors evidenced an employment contract, but held that the assignability of the parties' rights and the survival of those rights upon the death of the consul-

---

**23.** 82 B.R. at 145.

**24.** *Id.* at 146.

**25.** *Id.*

**26.** *Id.* at 146–47.

**27.** *Id.* at 145.

**28.** 141 B.R. at 416.

**29.** *Id.* at 411.

**30.** *Id.* at 412.

**31.** *Id.*

tants were the most significant factors indicating a non-employment relationship.[32] Therefore, the court held the agreement to be a disguised financing agreement and not an employment contract.[33] Thus, § 502(b)(7) did not apply.

### This Case

Contrary to Hiday's suggestion, the degree of control an employer exercises over the activities of an "employee," a determinative factor under agency principles, *Toyota Motor Sales U.S.A., Inc. v. Superior Court*, 220 Cal.App.3d 864, 269 Cal.Rptr. 647, 652 (1990), remains glaringly absent in the cases governing § 502(b)(7). If control of the employee's activities was of great concern under § 502(b)(7), many cases involving "consulting contracts" could be eliminated by this factual determination alone. The cases, however, do not support this approach.

In the present matter, there is no indication that Hiday and Wilson Foods had anything but an employment contract governing what amounted to an employment relationship. The terms contained in the written contract, delineated an "Employment Agreement," evidenced an employment relationship between Hiday and the debtor. The agreement provided for a specified salary, payable annually during the seven-year Consulting Period. It prohibited Hiday from rendering substantially similar services for competitors of the debtor under the non-compete clause. It also obligated Hiday to maintain the confidentiality of the debtor's business practices, and the contract was to cease upon the happening of specified events, including Hiday's death. The agreement was non-assignable except in the limited circumstance that The Impact Group, Inc. sold all or substantially all of its assets to another entity. The only factors identified in *Bergh* that are not present here are those concerning non-compensation benefits and the withholding and payment of income taxes.

Moreover, Hiday's consulting contract was contained in the same "Employment Agreement" that provided for her executive vice presidency, justifying the inference that Hiday's influence or expertise was considerable enough that she was able to secure a consulting contract at the same time as her executive vice presidency contract. This situation is not so far removed from the general statement that the purpose of § 502(b)(7) was to "limit the claims of key executives—employees, who for one reason or another, were able to exact long-term contracts calling for substantial remuneration," *Matter of Gee & Missler Services, Inc.*, 62 B.R. 841, 844 (Bankr. E.D.Mich.1986), or "who had been able to exact favorable terms of tenure and salaries while the business prospered," *In re Prospect Hill Resources, Inc.*, 837 F.2d 453, 455 (11th Cir.1988).

While the word "employee" has considerable legal significance, there is little indication that Congress added this word to the statute for any other reason than to insure direct contractual privity between the claimant and the debtor. Moreover, the purpose of vicarious liability is completely separate and legally distinct from the underlying purpose of the Bankruptcy Code and, especially, the operation of § 502(b)(7). The former insures injured parties that a financially stable employer will take responsibility for the tortious acts of an employee committed within the scope of his or her performance. The latter releases debtors from the burdensome futility of paying long-term salaries to persons hired for their financial business prowess who may be directly or indirectly responsible for making the debtor financially insolvent in the first place.

### Conclusion

The underlying purpose of § 502(b)(7) and relevant case law warrant the conclusion that this consulting contract, under which a claimant-consultant is an "independent contractor," is nevertheless an employment contract subject to the statutory cap on allowable damages resulting from its breach under § 502(b)(7).

---

**32.** *Id.* at 416.

**33.** *Id.*

The foregoing discussion shall constitute findings of fact and conclusions of law under Fed.R.Bankr.P. 7052 and Fed.R.Civ.P. 52(a).

IT IS SO ORDERED.