**In re OREAD, INC., Debtor.**

No. 01–40326.

United States Bankruptcy Court,
D. Kansas.

Nov. 28, 2001.

■■■■■■■■■■■■■■■■■■■■■

Robert L. Baer, Cosgrove Webb & Oman, Anne L. Baker, Commerce Bank Building, Tom R. Barnes, II, Charles R. Hay, Patricia A. Reeder, Woner Glenn Reeder, Girard & Riordan, Wesley F. Smith, Thomas A. Valentine, P.A., Topeka, KS, Gary D. Barnes, Mark T. Benedict, Husch & Eppenberger, Leland H. Corley, Lewis, Rice & Fingersh, Cynthia L. Dillard, Lisa A. Epps, Spencer, Fane, Britt & Browne LLP, Thomas W. Gray, Shughart, Thomson & Kilroy, P.C., Nancy S. Jochens, Blackwell Sanders Peper Martin, Erlene W. Krigel, Greta A. McMorris, Stinson Mag & Fizzell, Mark Moedritzer, Shook, Hardy & Bacon, Sheryl A. Reynolds, Shook, Hardy & Bacon, LLP, Todd W. Ruskamp, Mark A. Shaiken, Tim L. Sifers, Victoria L. Smith, Stinson, Mag & Fizzell PC, Frank Wendt, Niewald, Waldeck & Brown, P.C., David L. Zeiler, Kansas City, MO, Jason R. Buratti, York M. Faulkner, Griffith B. Price, Jr., Finnegan, Henderson, Farabow, Garrett, & Dunner, L.L.P., Washington, DC, Doris E. Desautel, Farmington, CT, John J. Cruciani, F. Stannard Lentz, Lentz & Clark, P.A., Eric C. Rajala, Gordon E. Wells, Jr., Lathrop & Gage, L.C., Overland Park, KS, Joel H. Ferrin, Ronald A. Sandler, Jones Day Reavis and Pogue, Chicago, IL, Diane P. Furr, Poyner & Spruill LLP, Charlotte, NC, Jeffrey K. Garfinkle, Brobeck, Phleger and Harrison LLP, San Diego, CA, Teresa A. Generous, St. Louis, MO, Cynthia F Grimes, Grimes & Rebein, L.C., Lenexa, KS, Charles A. Gruen, Hackensack, NJ, Evan H. Ice, Stevens, Brand, Golen, Thomas V. Murray, Barber Emerson Springer, Michael E. Riling, Riling, Burkhead, Fairchild & Nitcher, Calvin J. Karlin, John M. Knox, Lawrence, KS, Adam A. Lewis, Morrison & Forester, San Francisco, CA, Samuel P. Logan Law Firm LLC, Olathe, KS, Joseph Lubertazzi, Jr., McCarter and English LLP, Newark, NJ, Mark E. MacDonald, MacDonald and Schuble LLP, Richard E. Mikels, Mintz Levin Cohn Ferris Glovsky and Popeo, Scott Moskol Mintz Levin Cohn Ferris Glovsky and Pepeo, David J. Reier, Robert Somma, Schrader Harrison Goldstein & Manello, James H. Millar, Paul Weiss Rifkind Wharton & Garrison, Andrew S. Muller, Joseph Smolinsky, Chadbourne & Park LLP, New York City, Denise S. Mondell, Assistant Attorney General, Hartford, CT, Lawrence P. Platkin, Montville, NJ, Craig M. Prim, Murray and Murray, Cupertino, CA, Joanne B. Stutz, Evans & Mullinix, P.A., Shawnee, KS, David P. Troup, Junction City, KS, for creditor.

Jack M. Bassett, Harvey Law Associates, Farmington, CT, Paul Hoffmann, Morrison & Hecker, Rex A. Redlingshafer, Janice E. Stanton, Stanton & Redlingshafer, LLC, Kansas City, MO, for debtor.

## MEMORANDUM OPINION AND ORDER

JULIE A. ROBINSON, Bankruptcy Judge.

This matter came on for trial on August 28, 2001 and September 25, 2001 on the Application for Administrative Claim on Behalf of Connecticut General Life Insurance Company ("CGLIC"), seeking administrative expense treatment of its proof of claim, as amended.[1] The original amount

---

1. CGLIC filed a proof of claim for $720,321.99, but at trial admitted that the claim should be reduced by $60,000, based on a payment received from Debtor in April 2001. Other payments Debtor made postpeti-

of the claim, $720,321.99, later amended to $660,321.99, consists of three components: $559,751.00 of supplemental premium; $28,666.66 of unused bank account margins; and $131,904.33 for benefit payment account underfunding. Each of these three components includes actual and/or estimated insurance claims for medical services provided both prepetition and postpetition. Section 503(a)(1), Title 11, United States Code,[2] limits administrative expense treatment to costs and expenses ". . . for services rendered" postpetition. Debtor, Oread, Inc. ("Debtor"), acknowledges that CGLIC is entitled to an administrative expense for the reasonable cost of insuring Debtor in the six-week period between the filing of the bankruptcy petition and its rejection of the CGLIC contract.

CGLIC did not meet its burden of proving the amount of its claim attributable to insurance coverage and medical services rendered postpetition, or the reasonable cost of insuring Debtor during the pertinent period. Accordingly, the Court grants CGLIC's application for administrative expense in the limited amount of $81,783.00, the amount acknowledged by Debtor, which shall be credited against postpetition payments by Debtor. The Court denies the balance of CGLIC's administrative expense claim, which is allowed as a general unsecured claim.

In addition, Debtor claims that it is entitled to a refund from CGLIC, because its postpetition payments to CGLIC exceeded the reasonable cost of insurance during the six-week period. Like CGLIC, Debtor failed to prove the amount of payments attributable to coverage and services rendered postpetition, and the Court denies the Debtor's request for a refund.

tion, totaling $110,097.86 are accounted for in the proof of claim.

## Findings of Fact

In July 1999, Debtor entered into a contract with CGLIC to provide health insurance for Debtor's employees and their dependents. The insurance policy was under CGLIC's "cash management" program, which allows the insured company to reduce and/or defer part of the premium obligation. Under a "traditional" insurance policy, the premium consists of several components: the insurer's cost of administration; the insurer's estimate of claims to be paid during the policy period; and the insurer's estimate of "run-out" claims, that is, claims incurred during the policy period, but paid after the policy has terminated.

In contrast, under CGLIC's cash management program, the Debtor's monthly premium payments were lower because the premium included only a "residual premium" for CGLIC's monthly administrative costs plus the total of claims CGLIC paid that month, capped by a contractual "monthly maximum." The monthly premium did not include an amount for the estimate of run-out claims. Instead, Debtor was allowed to keep these funds, and not remit this "supplemental premium" for estimated run-out claims until the policy was terminated. Upon termination, CGLIC would demand payment of the entire supplemental premium. Debtor was expected to reserve funds for the supplemental premium obligation that would become due upon termination.

The "monthly maximum" component of the monthly premium was based on CGLIC's estimate of claims that would be presented for payment each month. The supplemental premium amount was based on CGLIC's estimate of run-out claims.

2. All future references are to statutory sections of the Bankruptcy Code, Title 11, United States Code.

Both estimates depended on the Debtor's actual claims history in the prior policy year, as well as CGLIC's evaluation of the demographics and risks of the pool of insured employees. This analysis was done annually, at the time the policy was renewed. Thus, the supplemental premium might be adjusted at each yearly anniversary and renewal of the policy.

The $559,751 supplemental premium component of CGLIC's proof of claim represents its estimate of run-out claims if the policy terminated on July 1, 2001. Although the formula by which CGLIC calculates its supplemental premium resulted in a supplemental premium effective July 1, 2000, CGLIC reduced the supplemental premium in recognition that one high cost employee, a cancer patient, had died during the 1999–2000 policy year.

Had the policy been renewed on July 1, 2001, the supplemental premium amount for policy year July 1, 2001 through June 30, 2002, might have been adjusted upward or downward, because CGLIC would analyze the actual claims history over the past policy year, and the current pool of insured employees and dependents; and then adjust the supplemental premium, as well as the monthly maximum. This was done with the goal of estimating claims with an accuracy such that little or no reserve or supplemental premium would be necessary, as the monthly maximum would sufficiently cover claims, both those presented and those to be presented in the future.

However, if the policy had been terminated on July 1, 2001, the Debtor would owe the $559,751 supplemental premium. In fact, any termination during the policy year ending on July 1, 2001, would have resulted in the Debtor owing a supplemental premium of $559,751. Thus, had the Debtor terminated this policy prepetition during the 2000–2001 policy year, it would have owed a supplemental premium of $559,751.

This policy was terminated on March 31, 2001, when the Debtor exercised its right to reject this executory contract, pursuant to § 365.[3] At that time, there was a $116,000 deficiency in the Debtor's Citibank Imprest Account, the account that CGLIC controlled and used to reimburse itself for insurance claims it paid each month, up to the contractual monthly maximum. During the six-week period between the filing of the bankruptcy on February 13, 2001, and the rejection of the contract, there was approximately $452,000 in funds in the bank account, available to reimburse CGLIC for claims paid. This $452,000 represents not only cash payments made by the Debtor to the account, but refunds by CGLIC of monies it had previously debited from the account that exceeded the Debtor's actual obligation to CGLIC. The bank account statement for February 2001 shows a $309,000 debit to reimburse CGLIC, which was reversed to reflect NSF. Subsequently, however, there was another $309,000 debit to CGLIC, such that it appears that CGLIC in fact was reimbursed in the amount of this $309,000 in addition to other debits shown on the February and March Citibank account statements. It is unclear whether CGLIC had available the entire $452,000 to apply to the Debtor's obligations, since part of this amount may have been transfers subsequently reversed. It is undisputed however, that the Debtor made postpetition cash payments to CGLIC in the amounts of $110,097.86 plus $60,000. Based on the Debtor's calculations, CGLIC owes the Debtor $93,066.18.[4]

---

**3.** 11 U.S.C. § 365(a).

**4.** Debtor calculates that it owed one-half of the maximum monthly payment of $60,819.72

Although in the postpetition period there were claims paid by CGLIC and then reimbursed to CGLIC out of the Citibank account, there was no accounting for which of these claims, if any, were incurred for postpetition services. In other words, there was no evidence of the amount of medical services obtained by Debtor's insured employees and their dependents during the postpetition period. In fact, both Pat Kelly, the Debtor's Human Relations Director, and William Daugherty, CGLIC's Regional Integration Director and formerly a senior underwriter for CGLIC, testified that most, if not all, of the claims presented postpetition would have been for medical services obtained before the February 13, 2001 bankruptcy petition date. Daugherty acknowledged that given the nature of medical and insurance billings, insurance claims are typically presented for payment three to four months after the medical services are received, and that it is not unusual for claims to be presented 12 to 18 months after the medical services. It is in fact *atypical* for claims to be presented less than 30 days after the services are received and bills incurred.

After rejecting the CGLIC contract on March 31, 2001, the Debtor insured its employees through Blue Cross, effective April 1, 2001. Blue Cross provided essentially the same medical coverage as CGLIC, but to a much smaller pool of employees. Based on the rates in the Blue Cross contract, the Debtor posits that the reasonable cost or value of the CGLIC insurance during the six-week postpetition period was $81,783, which represents Blue Cross's rates times the number of employees during the time period February 13, 2001 through March 31, 2001. The Debtor further posits that Blue Cross's rates are high, given that the smaller the insurance pool, the higher the rate. As of April 1, 2001, Blue Cross insured approximately 30–35 employees, while as of February 13, 2001. CGLIC insured about 100 employees.

Blue Cross's rates do not include the $559,721 supplemental premium Debtor owed CGLIC upon termination of the policy. Rather, Blue Cross's rates were based on a prospective estimate of claims, administrative costs, and run-out claims. William Daugherty testified that under a traditional policy, the reasonable cost of insurance for the 100 or so employees on February 13, 2001 would have been $103,000. Neither Daugherty's estimate, nor application of the Blue Cross rates to the insured employee population as of February 13, 2001, is based on an actual analysis of the demographics and risk of the 100 employees insured as of February 13, 2001.

## Discussion and Analysis

Allowed administrative expenses are claims,[5] including the "actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case."[6] These administrative expense claims are paid before other priority claims.[7] Because the statute limits administrative expense

---

for 2/01 plus $51,374, the maximum monthly payment for 3/01 for a total of $81,783.86, less the $174,850.04 it has made in postpetition payments, for a credit of $93,066.18. It appears to the Court, however, that this calculation does not include the monthly obligation for residual premiums.

5. other than so-called "gap claims" in an involuntary bankruptcy proceeding, allowed pursuant to § 502(f), Title 11, United States Code.

6. 11 U.S.C. § 503(b)(1)(A).

7. 11 U.S.C. § 507(a)(1).

treatment to claims for expenses "rendered" postpetition, wages and salaries for labor performed prepetition are not entitled to administrative expense treatment. Recognizing the critical nature of the continued labor of necessary employees, Congress provided, subject to a cap of $4300 per individual employee, that wages and salaries earned for labor and services performed in the 90–day period preceding bankruptcy would be paid as priority claims, with third tier priority, after administrative expense claims and allowed gap claims in involuntary bankruptcy proceedings.[8]

In *In re Amarex, Inc.*,[9] the court examined the postpetition limitation of § 503(b)(1)(A) as applied to a "guaranteed annualized bonus" payable to the debtor's general counsel at the end of the first year of employment. The general counsel commenced working prepetition and the bonus became payable postpetition. The court held that only that portion of the bonus attributable to the postpetition days worked was entitled to administrative expense treatment, reasoning that given the language of the employment contract, the employee earned this bonus "day by day."[10]

This case presents the question as to how the express limitation of § 503 to costs and expenses "rendered after the commencement of the case," is to be applied to various costs and expenses associated with medical insurance coverage of employees. Debtor did not have a "traditional method" insurance policy with CGLIC, whereby the insured pays a premium that covers the estimated cost of insurance, as well as the insurer's administrative costs. Cases interpreting § 503 in the context of these traditional policies generally limit administrative expense treatment to premiums due and payable postpetition.[11] The rationale is that this expense is actual and necessary to preserve the estate, because it represents an employer obligation to employees, necessary to the continued operation of the debtor.

■ Here, Debtor opted for CGLIC's "cash management program" that allowed Debtor to pay a much smaller premium and reserve its own funds for payment of claims presented, and for payment of estimated future claims. When Debtor filed this Chapter 11 bankruptcy on February 13, 2001, it was obligated to pay a small "residual premium" to CGLIC each month, which it did. It was also obligated each month to fund its Citibank account with sufficient funds to pay actual claims presented, up to a contractual, formulaic maximum. Debtor failed to fully fund the Citibank account during the six-week postpetition period preceding its rejection of the CGLIC executory contract on March 31, 2001. Debtor also did not remit the "supplemental premium" amount to CGLIC, which is the contractually required reserve amount for claims that are incurred during the policy, but not presented until after the policy is terminated. CGLIC also claims that Debtor owes an additional amount for "unused bank margins." CGLIC bears the burden of establishing the amount of its claim and its right to administrative expense treatment.[12]

---

8. 11 U.S.C. § 507(a)(3).

9. 853 F.2d 1526, 1531 (10th Cir.1988).

10. *Id.* at 1531.

11. *See, e.g., Guaranty Nat. Ins. Co. v. Greater Kansas City Transp., Inc.,* 90 B.R. 461, 463 (D.Kan.1988); *Amalgamated Insurance Fund v. William B. Kessler, Inc.,* 55 B.R. 735, 739 (S.D.N.Y.1985).

12. *General American Transportation Corporation v. Martin (In re Mid Region Petroleum, Inc.),* 1 F.3d 1130, 1132 (10th Cir.1993); *In re*

Because of the way CGLIC and Debtor's contract accounts for various expenses under the policy, and because of the very nature of medical and insurance billings, there are three categories of claims within CGLIC's claim for administrative expense. First, there is the shortfall or underfunding of the Citibank account in February and March 2001. This underfunding represents monies Debtor owes CGLIC, for CGLIC paying actual insurance claims of Debtor employees. Most, if not all of these insurance claims were for medical services received prepetition. Some of these claims incurred prepetition may have been presented for payment prepetition, but paid postpetition; other of these claims were presented and paid postpetition.

Second, there is the supplemental premium amount, which represents CGLIC's estimation, based on Debtor claims history, of the run-out claims for medical services received before March 31, 2001, but presented for payment sometime perhaps as long as two years after March 31, 2001. CGLIC acknowledges that virtually all of the run-out claims will be for medical services received before February 13, 2001, the date Debtor filed this bankruptcy.

Third, is the item called "unused bank margins" which CGLIC did not explain, and therefore deserves no further analysis.

Given the limiting language in § 503 to costs and expenses "rendered" postpetition, what insurance claims qualify for administrative expense treatment? Is it only those claims for medical services given postpetition; or does it include claims for prepetition services that are either presented and/or paid postpetition?

In *In re Eli Witt Co.*,[13] the court gave a narrow reading to § 503. Under the terms of its workmen's compensation insurance policy, the debtor was required to reimburse the insurer for advanced deductible payments made by the insurer. These advanced deductible payments included actual claims the insurer paid for injuries arising from both prepetition and postpetition accidents, as well as estimated amounts that the insurer would pay for injuries arising from both prepetition and postpetition accidents. The court ruled that § 503 applied only to those workmen's compensation claims actually paid for injuries suffered in postpetition accidents, following a line of cases that limited administrative expense treatment to claims arising from postpetition injury.[14] It rejected the insurer's argument that its claim arose postpetition at the time it made the demand for reimbursement, because such a rule would allow the insurer to control the characterization of its claim as prepetition or postpetition. A claim that arises prepetition and is demanded, billed or paid postpetition is not entitled to administrative expense status.[15]

 The policy warranting the highest priority for administrative expense claims is that creditors, including employees, that furnish actual and necessary services that benefit the estate, will not do so if they must share in distribution with general unsecured creditors who provided no postpetition benefit to the estate. Creditors and employees must be encouraged to participate and provide benefits to

---

*Amarex, Inc.,* 853 F.2d 1526, 1530 (10th Cir. 1988).

**13.** 213 B.R. 396, 397–98 (Bankr.M.D.Fla. 1997).

**14.** *Id.* at 399–400.

**15.** *Id.* at 399 (citing *Guaranty Nat. Ins. Co. v. Greater Kansas City Transp., Inc.,* 90 B.R. 461 (D.Kan.1988); *In re Broaddus Hosp. Ass'n,* 159 B.R. 763 (Bankr.N.D.W.Va.1993)).

the struggling debtor. To the extent they are induced to actually provide a necessary benefit for the preservation of the estate, they are assured they will be paid first, before priority and unsecured claims.[16] Thus, an expense is administrative only if it arises out of a transaction with the bankruptcy estate and only to the extent that the consideration underlying the claim was both supplied to and beneficial to the debtor in possession in the operation of the business.[17] A claim is not entitled to administrative expense status simply because the right to payment arises postpetition.[18]

■ Here, the supplemental premium came due at the end of the policy, which terminated upon the Debtor's rejection of the contract on March 31, 2001. Yet the consideration underlying this supplemental premium is mostly, if not entirely, the service of Debtor's employees to Debtor before February 13, 2001. Prepetition, these employees provided labor and services to Debtor, in consideration of Debtor's compensation of them, by wages, salary and benefits such as the medical insurance coverage at issue. These employees are entitled to file insurance claims for payment by Debtor because they were Debtor's employees at the time of their injuries, illness, or medical services. But, the evidence is that most of these insurance claims were for medical services obtained prepetition,

such that the consideration flowing from the employees for those services was their labor and services provided to Debtor prepetition.

Although one might argue that to effectuate the policy underlying administrative expense status, it is important that all insurance claims of current employees presented postpetition be paid; the same argument could be made regarding prepetition wages and salary that have not been paid as of the petition date. Yet, under § 507(a)(3), Congress gave prepetition wages a special priority, subject to limitations in time and amount, and under § 507(a)(4), it gave a lesser, but nevertheless priority status, to certain prepetition claims for debtor contributions to employee benefit plans.[19] In contrast, no such status has been afforded employee insurance claims.

As noted in *Amarex*, the court must look to the nature of the employee's compensation or benefit claimed, and whether the underlying consideration is for prepetition or postpetition services.[20] While courts are split on the treatment of severance pay, there is a consensus that if severance pay represents compensation for past services, it may not be entitled to administrative expense treatment; if severance pay represents compensation for the hardship caused by termination, it may be entitled

---

**16.** See Matter of Jartran, Inc., 732 F.2d 584, 586–87 (7th Cir.1984).

**17.** In re Amarex, 853 F.2d at 1530 (citing Trustees of Amalgamated Ins. Fund. v. McFarlin's, 789 F.2d 98, 101 (2d Cir.1986); In re Mammoth Mart, Inc., 536 F.2d 950, 954 (1st Cir.1976); Matter of Jartran, Inc., 732 F.2d at 586–87).

**18.** In re Amarex, 853 F.2d at 1531 (citing Christian Life Center Litigation Defense Comm. v. Silva (In re Christian Life Center), 821 F.2d 1370, 1374 (9th Cir.1987)).

**19.** In State Insurance Fund v. Southern Star Foods, Inc. (In re Southern Star Foods, Inc.), 144 F.3d 712 (10th Cir.1998), the court noted that courts are split on the question of including health insurance premiums as an employee benefit entitled to priority under § 507(a)(4); and further noting the cases that do extend this priority to health insurance benefits have not allowed third party insurers priority under § 507(a)(4). CGLIC does not claim a priority under § 507(a)(4).

**20.** In re Amarex, 853 F.2d at 1531.

to administrative expense treatment.[21] Vacation pay, the *Amarex* court notes, is generally accrued daily, and thus is an administrative expense only to the extent it accrues for postpetition labor or services.[22]

The court in *In re Smith Corona Corp.*,[23] took a contrary view, allowing administrative expense status for the entire "additional premium" due on the last day of a health, life and disability policy. The court viewed the additional premium as a separate element of compensation agreed to by the parties that benefitted the estate. This analysis is contrary to the plain language of § 503, however. Whether the parties agreed to the compensation or not is irrelevant. Although this type of insurance coverage obviously benefits employees and thus benefits their employer, it only benefits the estate to the extent that the consideration for the insurance coverage was labor or services to the estate. Beyond that, the insurance coverage benefitted the Debtor prepetition, but provided no benefit to the bankruptcy estate. The Court finds the analysis in *Eli Witt* and *Amarex* to be more reasoned and persuasive.

■ Given that CGLIC's claim is entitled to administrative expense priority only to the extent the insurance claim is for medical services rendered postpetition, CGLIC has failed its burden of proving the amount of its claim. CGLIC did not provide a separate accounting for insurance claims arising from prepetition versus postpetition medical services. Thus, the Court will deny it administrative expense status on this basis. Moreover, even if

CGLIC had separately accounted for prepetition and postpetition insurance claims, its claim for run-out claims is estimated. CGLIC cannot establish with any reasonable certainty what the total amount of insurance claims for postpetition injury or services will ultimately be. Because granting administrative expense status requires that the claim arise from providing an actual benefit, the court in *Eli Witt* disallowed estimated amounts claimed by the insurer for injuries suffered in both prepetition and postpetition accidents.[24] Even for injuries suffered in postpetition accidents, if the claim had not been presented by the time of plan confirmation, it could not be characterized as an actual claim, necessary to the preservation of the estate.[25] The court further noted that the record was devoid of evidence by which these yet to be presented claims could be estimated for purposes of allowance under § 502(c), apparently rejecting the insurer's statistical analysis of the likelihood of such claims. In this case, CGLIC has similarly failed to provide evidence from which its claim could be estimated.

■ The Trustee contends that since Debtor rejected its executory contract, CGLIC is entitled to receive as an administrative expense only the reasonable value of the service provided, i.e., the insurance coverage for the six-week postpetition, pre-rejection period. In *N.L.R.B. v. Bildisco and Bildisco*,[26] the Supreme Court held that during the postpetition period in which the debtor has yet to assume or reject an executory contract, the debtor is obligated to pay for the reasonable value of services provided under the contract.

---

21. *Id.*

22. *Id.*, n. 5.

23. 210 B.R. 243, 246 (Bankr.D.Del.1997).

24. *In re Eli Witt, Co.*, 213 B.R. at 400.

25. *Id.*

26. 465 U.S. 513, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984).

CGLIC cites the case of *In re Three Star Telecast, Inc.,*[27] wherein the court held that if a debtor elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor is obligated to pay for the reasonable value of the services. This, according to CGLIC's evidence, is $103,000, the amount Debtor would owe under the traditional method of premium payments for the six-week postpetition pre-rejection period, based on its number of employees times the CGLIC's formulaic risk factor. In contrast, Debtor contends that the reasonable value of the CGLIC insurance during the six-week postpetition period was $81,783, which represents Blue Cross's rates times the number of employees during that time period.

If Debtor's policy from CGLIC were under the traditional method, the premiums accruing postpetition would include a component for estimated claims arising during policy coverage, but not yet presented. Thus, CGLIC protests that not allowing its supplemental premium administrative expense status is prejudicial. CGLIC misses the point, CGLIC is entitled to administrative expense status for that portion of the supplemental premium that can be attributed to claims arising (that is, for services rendered) from February 13 to March 31, 2001. But, CGLIC has failed its burden of proving what por-

tion of its supplemental premium can be attributed to run-out claims arising from medical services provided postpetition.[28]

CGLIC did not explain to the Court's satisfaction the pool of employees upon which it based its formulaic risk factor. While the Debtor's figure is also flawed, it is based on Blue Cross's actual underwriting experience with Debtor's employees, albeit a smaller pool. Accordingly, the Court adopts the Debtor's figure of $81,783 as the reasonable value of services provided.

At trial, Debtor raised the issue of whether it is entitled to a refund from CGLIC to the extent its postpetition payments exceeded the reasonable cost of insurance during the six-week period before rejection of the contract. It is undisputed that Debtor made postpetition payments in the amount of $60,000 and $110,097.86 and that CGLIC reduced its claim by $60,000. Like CGLIC, however, Debtor did not provide an accounting as to whether the $110,097.86 total postpetition payments apply to coverage or services rendered postpetition, and the Court denies its request for a refund of the approximately $30,000 in excess of the reasonable cost of insurance. However, the Court declines to grant either party a windfall from its ruling, and holds that CGLIC's $81,783 administrative claim shall be credited in full

**27.** 93 B.R. 310, 312 (D.Puerto Rico 1988).

**28.** Several courts have examined insurance components analogous to the reserve account CGLIC calls "supplemental premiums." The Eighth Circuit Court of Appeals held these so called "retrospective premiums" that accrue prepetition and continue to accrue postpetition, but which are adjusted and become payable postpetition, are given administrative expense status only to the extent of the premiums that are attributable to postpetition insurance coverage. In the case of *Potter v. CNA Ins. Co. (In re MEI Diversified, Inc.),* 106 F.3d 829, 832 (8th Cir.1997), the court granted administrative expense status to the workmen's compensation premiums paid postpetition and attributable to postpetition periods of employment. Even though the insurance policy provided for retrospective rating and adjustment of premium amounts based on the actual loss experience of the insured, such retrospective adjustments did not render the insurance claims contingent. *See gen., In re Texscan Corp.,* 976 F.2d 1269 (9th Cir.1992) (retrospective plan not executory contract).

against the Debtor's postpetition payments.

**IT IS THEREFORE ORDERED BY THE COURT** that CGLIC's Application for Administrative Expense is GRANTED in the sum of $81,783, which shall be credited in full against postpetition payments made by Debtor.

**IT IS FURTHER ORDERED BY THE COURT** that the balance of CGLIC's claim in the amount of $578,538.99 shall be allowed as a general unsecured claim.

**IT IS FURTHER ORDERED BY THE COURT** that Debtor's claim for a refund from CGLIC is DENIED.

This Memorandum shall constitute findings of fact and conclusions of law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by Rule 9021 of the Federal Rules of Bankruptcy Procedure and Rule 58 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.